# EXHIBIT F

1   Terry W. Bird – Bar No. 49038
        tbird@birdmarella.com
2   Dorothy Wolpert – Bar No. 73213
        dwolpert@birdmarella.com
3   *Naeun Rim – Bar No. 263558
        nrim@birdmarella.com
4   Shoshana E. Bannett – Bar No. 241977
        sbannett@birdmarella.com
5   Christopher J. Lee – Bar No. 322140
        clee@birdmarella.com
6   Jimmy Threatt – Bar No. 325317
        jthreatt@birdmarella.com
7   BIRD, MARELLA, BOXER,
    WOLPERT, NESSIM, DROOKS,
8   LINCENBERG & RHOW, P.C.
    1875 Century Park East, 23rd Floor
9   Los Angeles, California 90067-2561
    Telephone: (310) 201-2100
10  Facsimile: (310) 201-2110

11  Peter J. Eliasberg – Bar No. 189110
        peliasberg@aclusocal.org
12  Peter Bibring – Bar No. 223981
        pbibring@aclusocal.org
13  ACLU FOUNDATION OF
    SOUTHERN CALIFORNIA
14  1313 West 8th Street
    Los Angeles, CA 90017
15  Telephone: (213) 977-9500
    Facsimile: (213) 977-5297

    Donald Specter – Bar No. 83925
        dspecter@prisonlaw.com
    Sara Norman – Bar No. 189536
        snorman@prisonlaw.com
    PRISON LAW OFFICE
    1917 Fifth Street
    Berkeley, California 94710
    Telephone: (510) 280-2621
    Facsimile: (510) 280-2704

16
17  Attorneys for Plaintiff-Petitioners

18              **UNITED STATES DISTRICT COURT**

19      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

20  YONNEDIL CARROR TORRES;            CASE NO. 2:20-cv-04450-CBM-PVCx
    VINCENT REED; FELIX SAMUEL
21  GARCIA; ANDRE BROWN; and           **PLAINTIFF-PETITIONERS'**
    SHAWN L. FEARS, individually and   **NOTICE OF *EX PARTE***
22  on behalf of all others similarly situated,  **APPICATION AND *EX PARTE***
                                       **APPLICATION FOR TEMPORARY**
23              Plaintiff-Petitioners,  **RESTRAINING ORDER AND**
                                       **ORDER TO SHOW CAUSE RE:**
24          vs.                        **PRELIMINARY INJUNCTION;**
                                       **MEMORANDUM OF POINTS AND**
25  LOUIS MILUSNIC, in his capacity as  **AUTHORITIES**
    Warden of Lompoc; and MICHAEL
26  CARVAJAL, in his capacity as Director  Filed Concurrently with Declaration of
    of the Bureau of Prisons,          Naeun Rim; Declaration of Jimmy
27                                      Threatt; and Proposed Order
                Defendant-Respondents.
28                                      Hon. Consuelo B. Marshall. Crtrm 8B

3651124

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff-Petitioners ("Petitioners") Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears, individually and on behalf of all others similarly situated, apply, *ex parte*, for a temporary restraining order ("TRO") and an order to show cause ("OSC") re preliminary injunction against Defendant-Respondents ("Respondents") Louis Milusnic, in his official capacity as Warden of FCI Lompoc and USP Lompoc, and Michael Carvajal, in his official capacity as Director of the Bureau of Prisons, enjoining Respondents from continuing to violate Petitioners' rights under the Eighth Amendment to the United States Constitution to be free from cruel and unusual punishment in relation to Respondents' failed response to the COVID-19 crisis.

Specifically, Petitioners request that the Court issue a TRO and an OSC re preliminary injunction in the form of the proposed order submitted concurrently with this *ex parte* application. This *ex parte* application is made pursuant to 17 U.S.C. § 502(a), Federal Rule of Civil Procedure 65, and Local Rule 65.

This *ex parte* application is based upon this Notice, the Memorandum of Points and Authorities, the Declaration of Naeun Rim, the declaration of Jimmy Threatt, all accompanying exhibits, the filings in this action, the Proposed Order, which is being lodged in accordance with Local Rule 7-20, and any and all evidence, argument, or other matters that may be presented at the hearing.

Since May 20, 2020, counsel for Petitioners have been meeting and conferring with counsel for Respondents Assistant United States Attorneys Joannne Osinoff, David M. Harris, and Keith Staub by phone and by email regarding this *ex parte* application for a temporary restraining order ("TRO") and order to show cause ("OSC") re: preliminary injunction, as well as a request to file an oversized brief and a request for expedited discovery, both in this matter and in *Wilson v. Ponce*, 20-CV-4451 MWF (MRWx), which involves substantially similar issues.

2

(Declaration of Naeun Rim ("Rim Decl.") ¶ 22.) They indicated they intended to oppose *ex parte* both applications. On May 29, 2020, I emailed Mr. Staub to see if Respondents had changed their positions. To date, I have not received a response. Petitioners anticipate Respondents will object. (*Id.*)

*Local Rule 5-4.3.4(a)(2)(i) Compliance: Filer attests that all other signatories listed concur in the filing's content and have authorized this filing.*

DATED: June 1, 2020                    Respectfully submitted,

Terry W. Bird
Dorothy Wolpert
Naeun Rim
Shoshana E. Bannett
Christopher J. Lee
Jimmy Threatt
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By:     */s/ Naeun Rim*
                    Naeun Rim
          Attorneys for Plaintiff-Petitioners

DATED: June 1, 2020                    Peter J. Eliasberg
Peter Bibring
ACLU Foundation of Southern California

By:     */s/ Peter Bibring*
                    Peter Bibring
          Attorneys for Plaintiff-Petitioners

DATED: June 1, 2020                    Donald Specter
Sara Norman
Prison Law Office

By:     */s/ Donald Specter*
                    Donald Specter
          Attorneys for Plaintiff-Petitioners

3651124

3

# **TABLE OF CONTENTS**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................12

I.   INTRODUCTION.................................................................................12

II.  FACTUAL BACKGROUND................................................................17

    A.   There is a Dangerous and Uncontrolled COVID-19 Outbreak at Lompoc. ..........................................................................................17

    B.   Lompoc Is Not Properly Testing, Treating, or Isolating the Named Petitioners.........................................................................21

    C.   Lompoc Refuses to Implement Essential Measures to Protect Prisoners and Mitigate the Spread of COVID-19 ...........................24

        1.   Rather Than Using Their Power to Release At-Risk Prisoners and Reduce Overcrowding, Respondents Moved People Into Other Unsanitary Spaces.....................................24

        2.   Respondents Ignored CDC-Issued Guidance for Managing the Virus in Correctional Facilities. .........................................26

        3.   Respondents defied Attorney General Barr's direction to "immediately maximize appropriate transfers" to home confinement ..............................................................................34

    D.   Lompoc Is Incapable of Providing Adequate Medical Care for COVID-19 Patients, Posing an Unconstitutional Threat Both to the Incarcerated and to the Local Community. ................................37

III. ARGUMENT ......................................................................................40

    A.   The Court Should Temporarily Enlarge Petitioners' Custody Pursuant to a Supervised, Individualized Inquiry and Require Lompoc to Provide Adequate Medical Care to COVID Positive Patients...........................................................................................40

    B.   Petitioners Are Likely To Succeed on the Merits of Their Eighth Amendment Claims.......................................................................42

        1.   The Conditions at Lompoc, Combined with the Risks Posed by COVID-19, Create a Serious Medical Need .............42

        2.   Respondents Acted With Deliberate Indifference to the Health and Safety of COVID-19 Negative Prisoners. ...............44

        3.   Respondents Acted With Deliberate Indifference to the Medical Needs of COVID-19 Positive Prisoners.....................51

        4.   Petitioners Are Not Required To Exhaust Administrative Remedies Here. ........................................................................54

1
         a.     Exhaustion of administrative remedies for the §
2241 claim should be waived ........................................... 54

2
         b.     Exhaustion is not required under the PLRA because
an administrative remedy is "effectively

3
unavailable" at this time. ................................................ 57

4
     5.     Petitioners' habeas claims are properly brought under
Section 2241 ............................................................................. 59

5

6
C.     Petitioners and the Class Face Irreparable Harm if They
Continue to Be Incarcerated and If Unsafe Conditions are

7
Allowed to Persist At Lompoc ........................................................... 61

8
D.     It Is in the Public Interest to Release Appropriate Prisoners to
Home Confinement and Institute Other Measures to Prevent the

9
Spread of COVID-19 ....................................................................... 64

10
E.     This Court Has the Power to Grant a TRO and Issue a
Provisional Order of Enlargement of Custody While This Habeas

11
Action is Pending. ........................................................................... 67

12
IV.     CONCLUSION ........................................................................................ 70

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..........................................................................41

*Baker v. Sard*,
    420 F.2d 1342 (D.C. Cir. 1969)........................................................................69

*Banks v. Booth*,
    No. 20-849 (CKK) (D.D.C. April 20, 2020).....................................................53

*Basank v. Decker*,
    No. 20-CV-2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26,
    2020) .................................................................................................................44

*Bent v. Barr*,
    No. 19-CV-06123, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) ................ 64, 66

*Calley v. Callaway*,
    496 F.2d 701 (5th Cir.1974) ..............................................................................69

*Camacho Lopez v. Lowe*,
    No. 20-CV-563, 2020 WL 1689874 (M.D. Pa. Apr. 7, 2020)...........................54

*Cameron v. Bouchard*,
    No. 20-CV-10494, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) ............ 44, 51

*Carmona v. U.S. Bureau of Prisons*,
    243 F.3d 629 (2d Cir. 2001) ..............................................................................61

*Castillo v. Barr*,
    --- F. Supp. 3d ---, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020)
    (Hatter, J.)................................................................................................... 64, 66

*Chalk v. U.S. Dist. Court Cent. Dist. of California*,
    840 F2d 701 (9th Cir. 1988)..............................................................................63

*Cherek v. United States*,
    767 F.2d 335 (7th Cir.1985)...............................................................................69

*Committee of Cen. Am. Refugees v. INS*,
    795 F.2d 1434 (9th Cir. 1986) ...........................................................................41

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

*Coronel v. Decker,*
    --- F. Supp. 3d ---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ......................65

*Corr Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ...............................................................................................62

*Derron B. v. Tsoukaris,*
    No. 20-CV-3679 (JMV), 2020 WL 2079300......................................................54

*Doe v. Barr,*
    No. 20-CV-02141-LB, 2020 WL 1820667 (N.D. Cal. April 12,
    2020) .....................................................................................................................64

*Dotson v. Clark,*
    900 F.2d 77 (6th Cir. 1990)..................................................................................69

*Edmo v. Corizon, Inc.,*
    935 F.3d 757 (9th Cir. 2019) ................................................................................63

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ................................................................................ 43, 45, 62

*Feliciano v. Gonzales,*
    13 F. Supp. 2d 151 (D.P.R. 1998).........................................................................51

*Fraihat v. U.S. Immigration and Customs Enforcement,*
    --F.Supp.--, 2020 WL 1932570 (C.D. Cal. April 20, 2020) ................... 44, 63, 64

*Frontline Med. Assoc., Inc. v. Coventry Healthcare Workers
    Compensation, Inc.,*
    620 F. Supp. 2d 1109 (C.D. Cal. 2009)................................................................41

*Hall v. Superior Court,*
    2020 WL 890044 (N.D. Cal. March 8, 2010) .......................................................69

*Harris v. Bd. of Supervisors, Los Angeles Cty.,*
    366 F.3d 754 (9th Cir. 2004) ................................................................................63

*Harris v. Garner,*
    216 F.3d 970 (11th Cir. 2000) ..............................................................................62

*Helling v. McKinney,*
    509 U.S. 25 (1993) ......................................................................................... 43, 63

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.*,
736 F.3d 1239 (9th Cir. 2013) ............................................................63

*Hernandez v. Campbell*,
204 F.3d 861 (9th Cir. 2000) ............................................................60

*Hernandez v. County of Monterey*,
110 F. Supp. 3d 929 (N.D. Cal. 2015)...............................................51

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ......................................................55, 66

*Hill v. Dexter*,
No. CV 09-778 VBF, 2010 WL 2631661 (C.D. Cal. March 2, 2010) ...............45

*Inland Empire-Immigrant Youth Collective v. Nielsen*,
No. 17-CV-2048, 2018 WL 1061408 (C.D. Cal. February 26, 2018) ...............64

*Jeffries v. Block*,
940 F. Supp. 1509 (C.D. Cal. 1996).................................................43

*Jett v. Penner*,
439 F.3d 1091 (9th Cir. 2006) ..........................................................52

*Jolly v. Coughlin*,
76 F.3d 468 (2d Cir. 1996) ...............................................................43

*Jones v. Bock*,
549 U.S. 199 (2007) .........................................................................58

*Jovel v. Decker*,
No. 20-CV-308 (GBD), 2020 WL 1467397 (S.D.N.Y. Mar. 26, 2020) .........................................................................................65

*Kaur v. U.S. Dep't of Homeland Security*,
2020 WL 1939386.............................................................................64

*King v. City of L.A.*,
885 F.3d 548 (9th Cir. 2018) ............................................................42

*Land v. Deeds*,
878 F.2d 318 (9th Cir. 1989) ............................................................69

*Landano v. Rafferty*,
970 F.2d 1230 (3d Cir. 1992) ...........................................................69

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

*Mapp v. Reno,*
 241 F.3d 221 (2d Cir.2001) ...............................................................69

*Martin v. Solem,*
 801 F.2d 324 (8th Cir. 1986) ...........................................................69

*Martinez-Brooks v. Easter,*
 No. 3:20-cv-00569-MPS, 2020 WL 2405350 (D. Conn. May 12,
 2020) ...................................................................................*passim*

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ......................................................63, 65

*Naddi v. Hill,*
 106 F.3d 275 (9th Cir. 1997) ...........................................................61

*Nken v. Holder,*
 556 U.S. 418 (2009) ........................................................................65

*Perez v. Cox,*
 788 Fed. Appx. 438 (9th Cir. 2019) .................................................45

*Pfaff v. Wells,*
 648 F.2d 689 (10th Cir. 1981) .........................................................69

*Preiser v. Rodriguez,*
 411 U.S. 475 (1973) ........................................................................60

*Republic of the Philippines v. Marcos,*
 862 F.2d 1355 (9th Cir. 1988) ........................................................42

*Roman v. Wolf,*
 No. CV 20-00768 (TJH), 2020 WL 1952656 (C.D. Cal. Apr. 23,
 2020) ...............................................................................................41

*Ross v. Blake,*
 136 S. Ct 1850 (2016)......................................................................58

*Sapp v. Kimbrell,*
 623 F.3d 813 (9th Cir. 2010) ..........................................................58

*Smith v. Washington,*
 781 Fed. Appx. 595 (9th Cir. 2019) ................................................45

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

*Thakker v. Doll*,
   No. 20-CV-0480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020).......................65

*Thomas v. U.S*,
   779 F. Supp. 2d 154 (D.D.C. 2011) ...................................................62

*United States v. Arreola-Bretado*,
   --F.Supp.3d--, 2020 WL 2535049 (S.D. Cal. May 15, 2020)............................67

*United States v. Brady*,
   No. 20-CV-623, 2020 WL 1865486 (M.D. Pa. Apr. 14, 2020).........................65

*United States. v. Paige*,
   369 F. Supp. 2d 1257 (D. Mon. 2005) ...............................................57

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) ...................................................................41

*Valentine v. Collier*,
   590 U.S. ___ (2020), 2020 WL 249751 (May 14, 2020) ............................ 46, 59

*Wilson v. Williams*,
   20-3447, ECF No. 23-1 (6th Cir. May 4, 2020)................................................61

*Wilson v. Williams*,
   2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) ........................................*passim*

*Wilson v. Williams*,
   No. 20-3447, ECF No. 23 (6th Cir. May 4, 2020)................................................64

*Winter v. Nat'l Resources Defense Council*,
   555 U.S. 7 (2008) ................................................................. 41, 62

*Woodcock v. Donnelly*,
   470 F.2d 93 (1st Cir. 1972) ...........................................................69

*Xochihua-Jaimes v. Barr*,
   798 F. App'x 52 (9th Cir. Mar. 24, 2020) ............................................65

**Statutes**

18 U.S.C. § 3624(b)...........................................................................70

18 U.S.C. § 3636(g)(2) ......................................................................61

3651124

28 U.S.C. §§ 2241, 2254, and 2255 ........................................................62

28 U.S.C. § 2243 ....................................................................................69

**Other Authorities**

Fed. R. Civ. P. 65(b)(1)(A) ....................................................................41

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This case presents, quite literally, a matter of life or death. Each hour, the people imprisoned at FCI Lompoc and USP Lompoc (collectively "Lompoc"), whether incarcerated for minor or major offenses, are facing the death penalty. On May 26, 2020, in the time it took to prepare this application for emergency relief after the filing of the initial Complaint, a third person incarcerated at Lompoc—one who had not been sentenced to death by a judge or jury—died of complications related to COVID-19.[1] Disturbingly, Mohamed Yusuf was 37 years with no pre-existing conditions. BOP states only that he tested positive for COVID-19 on May 7, 2020, was placed in "isolation," and found dead 18 days later.[2] Prisoners housed with Mr. Yusuf confirm that Mr. Yusuf had been very ill for four days in the dormitory, and repeatedly asked for, and was refused medical attention after being accused of "faking it."[3] Eventually, Mr. Yusuf collapsed and fell out of his bunk and went into convulsions on the ground.[4] The prisoners made as much noise as

---

[1] Tyler Hayden, *More Suffering and Death at Lompoc Prison Racked with COVID-19*, SANTA BARBARA INDEPENDENT (May 29, 2020) *available at* https://www.independent.com/2020/05/29/more-suffering-and-death-at-lompoc-prison-wracked-with-covid-19/

[2] Federal Bureau of Prisons, Inmate Death at USP Lompoc's Satellite Camp, May 6, 2020, *available at* https://www.bop.gov/resources/news/pdfs/20200507_press_release_lox.pdf

[3] Declaration of Naeun Rim ("Rim Decl.") Exh. S (Declaration of Shelly Hemmelgarn ("Hemmelgarn Decl.") ¶ 5); *see also* Hayden, *supra*, *available at* https://www.independent.com/2020/05/29/more-suffering-and-death-at-lompoc-prison-wracked-with-covid-19/ (also recounting a story about inmate Edgar Udarbe, who lay semi-comatose for four days in his dorm, while correctional officers refused to take action).

[4] Rim Decl. Exh. S (Hemmelgarn Decl. ¶ 5).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

possible to try and get help from the staff, but they were so slow in responding that Mr. Yusuf turned blue and died before they got there.[5]

Petitioner Yonnedil Carror Torres is scared of suffering Mr. Yusuf's fate. He sits in his two-man cell at Lompoc, the site of one the worst COVID-19 outbreaks at a correctional facility in the country. At the age of 24, he is scarred with acute lung damage after his recent battle with a life-threatening case of coronavirus. For five days, he suffered from obvious coronavirus symptoms, including fever, diarrhea, and body aches, but his requests for medical assistance were ignored. His story is eerily reminiscent of Mr. Yusuf's—it was not until he went into acute respiratory failure and collapsed in his cell, and after every prisoner on his block banged their cell doors in unison to demand that he receive medical attention, that Lompoc staff tested Mr. Torres for COVID-19. He tested positive and was taken to a hospital, where he had to be put on a ventilator. His voice is now so hoarse that his sister does not recognize it.[6] He is afraid of becoming the next updated statistic under the "Inmate Deaths" column of the BOP's COVID-19 webpage.

Like Mr. Torres, Lompoc staff fear there will be more deaths too. The BOP officers' union filed on imminent danger complaint with OSHA at the end of March, citing Lompoc as one of the prisons exposing employees to "recognized hazards causing or are likely to cause death or serious physical harm."[7] Staff have not been provided with adequate personal protective equipment ("PPE"), have not been permitted to isolate and quarantine properly, and are still being asked to transfer

---

[5]  *Id.*

[6]  Rim Decl. Exh. F (Declaration of Kiara Carror ("Carror Decl."))

[7]  Occupational Safety and Health Administration, Notice of Alleged Safety or Health Hazards, Mar. 31, 2020, *available at* https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1  prisoners for non-medical reasons, even if they are showing symptoms.[8]

2       There is good reason that prisoners and staff alike are fearful of the conditions
3  at Lompoc. Lompoc is currently engulfed by COVID-19. The Lompoc outbreak is
4  the worst outbreak of COVID-19 at any BOP facility in the country.[9] Over the
5  course of a mere two months, at least 1,066 prisoners at Lompoc have tested
6  positive for COVID-19.[10] Although BOP has apparently re-categorized most of the
7  prisoners who recently tested positive as being "recovered," a measurement that is
8  not being used by the CDC,[11] this amounts to nothing more than reshuffling of
9  chairs on the deck of the Titanic—the recent death of a "recovered" prisoner at
10 Terminal Island is a clear indication of how superficial that distinction is.[12] The
11 numbers are especially astonishing given that only FCI Lompoc, a low security
12 facility, has undergone mass testing.  UPS Lompoc is still only testing prisoners
13 who show severe symptoms, meaning more than half of the prisoners at Lompoc

14 _____

[8]  Lia Russell, *Union Warns of Coronavirus Exposure in Federal Prisons, VA Facilities*, FCW (Apr. 7, 2020) https://fcw.com/articles/2020/04/07/afge-osha-complaints-covid19.aspx

[9]  Richard Winton, *Coronavirus Outbreak at Lompoc Prison is the Worst in the Nation: 69 Inmates, 25 Staff Infected*, LOS ANGELES TIMES (Apr. 16, 2020) *available at* https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected

[10]  Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed June 1, 2020).

[11]  Catherine Marfin, *Why Aren't Coronavirus Recoveries Always Reported*, THE DALLAS MORNING NEWS (May 19, 2020) *available at* https://www.dallasnews.com/news/public-health/2020/05/19/why-arent-coronavirus-recoveries-always-reported/?outputType=amp

[12]  Federal Bureau of Prisons, Inmate Death at FCI Terminal Island, May 6, 2020, *available at* https://www.bop.gov/resources/news/pdfs/20200527_press_release_trm.pdf

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

have still not been tested. The prison is overcrowded and overwhelmed, unwilling to protect prisoners who have tested negative from the virus and unable to adequately treat its COVID-19 patients. Leadership at Lompoc is in chaos—since the first positive cases were reported in late March, Lompoc has been through *three wardens* in just two months.[13]

What are Respondents doing in the face of this catastrophe? Instead of using the authority Congress provided them under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to release medically vulnerable prisoners into home confinement, and instead of accelerating their evaluation of compassionate release requests, Lompoc chose to cut off prisoners' access to communication with the outside world by severely restricting phone and email privileges—against the recommendation of the CDC—and shuffled sick prisoners from one unsafe, crowded location to another. Even after a belated round of mass testing confirmed that their half-baked social distancing measures had failed miserably, Respondents are refusing to implement the obvious solution that would both prevent even more infection and reduce the strain on medical resources: *significantly reducing the prisoner population*. Experts confirm that it is impossible for Respondents to make Lompoc compliant with CDC guidelines without taking this basic step.[14] But Respondents have virtually ignored the directive of Attorney General William Barr, who issued a memo on April 3, 2020, that urged the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at facilities with major coronavirus outbreaks like Lompoc,

---

[13]  Tyler Hayden, Lompoc Prison Explodes with Active COVID-19 Cases, SANTA BARBARA INDEPENDENT (May 13, 2020) *available at* https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/

[14]  Rim Decl. Exh. L (Declaration of Samsher Samra ("Samra Decl.") ¶¶12-20.)

including "*all at-risk inmates—not only those who were previously eligible for transfer.*"[15] Despite this clear directive, according to an advisory recently circulated to prisoners at Lompoc, Respondents are *still using the same criteria for home confinement that was in place before passage of the CARES Act.*[16] Out of the more than 2,500 people imprisoned at Lompoc, only 59 are even under consideration based on this outdated criteria, and less than half are scheduled for release.[17] Respondents' deliberate and knowing refusal to use their authority to reduce the prison population swiftly and to implement effective measures to protect prisoners from this highly contagious and deadly disease violates the Eighth Amendment.

Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears, individually and on behalf of all others similarly situated, move for a Temporary Restraining Order and ask that this Court put in place a structured, court-supervised process for immediate, individualized consideration of each prisoner's suitability for release on an accelerated schedule that is more focused on the critical factors of prisoner and public safety than the current home confinement review process at Lompoc. Petitioners are asking that the Court institute this process with the goal of releasing a sufficient number of prisoners to allow for physical distancing, quarantine, and isolation in accordance with CDC guidelines for those who remain at Lompoc, and to provide the minimally adequate medical care required by the Eighth Amendment. At 37 years old and with no preexisting conditions, Mr. Yusuf, who was serving an 11-year sentence for

---

[15] Rim Decl. Exh. A (Memorandum For Director of Bureau of Prisons re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, Office of the Attorney General, Washington, D.C. (Apr. 3, 2020)) at 8-9 (emphasis added).

[16] Rim Decl. Exh. Q (Talking Points for Inmate Asking About Early Releases During COVID-19 as of 4/20/20).

[17] *Id*.

3651124

conspiring to support a foreign terrorist organization, was not likely a candidate for home confinement or compassionate release—but if Respondents had put more medically vulnerable people on home confinement and reduced the population enough to allow for proper isolation and social distancing, Mr. Yusuf might still be alive today. Congress gave Respondents the ability to act humanely and constitutionally, and Respondents have refused. Immediate judicial relief is necessary to hold Respondents accountable and ensure that more lives are not unnecessarily not lost.

## II. FACTUAL BACKGROUND

### A. There is a Dangerous and Uncontrolled COVID-19 Outbreak at Lompoc.

FCI Lompoc is a low security prison located in Santa Barbara County, California. Just down the road is its sister facility USP Lompoc, which houses medium security individuals and also contains minimum security satellite camps. Lompoc is currently home to 2,626 of these prisoners,[18] which is tragically at least three fewer than when the COVID-19 public health crisis began. It is clear from the public record that Respondents will not act to meet the bare minimum requirements of the Constitution unless forced to do so. On March 21, 2020, only two months ago, BOP reported the first case of a prisoner testing positive for COVID-19. Although public health officials warned that BOP was walking into a "disaster waiting to happen[,]" BOP claimed that it was "confident" in its " robust efforts to keep correctional workers and the inmate population safe and healthy[.]"[19]   A little

---

[18]  Federal Bureau of Prisons, *FCI Lompoc* https://www.bop.gov/locations/institutions/lof/ and *USP Lompoc* https://www.bop.gov/locations/institutions/lom/, as of June 1, 2020.

[19]  Kimberly Kindy, Emma Brown, Dalton Bennett, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, THE WASHINGTON POST (March 25, 2020) *available at*

over a month later, BOP's own statistics show that this confidence was fatally misplaced.

In the wake of this alarming report, hundreds of protesters have descended on Lompoc demanding that prisoners be released.[20] Since the filing of this lawsuit, Lompoc's official reported numbers have suddenly taken a precipitous turn, with Lompoc claiming that nearly all of their prisoners were now "recovered." It is not clear how BOP is defining "recovered" or how they are housing these so-called recovered patients, but according to doctors it is important to continue to quarantine, monitor, and protect "recovered" prisoners, given the unknowns regarding whether people who have been infected develop immunity against future infection.[21] The CDC does not re-categorize positive cases as "recovered" on a national level, and there is no standard definition for "recovery" that is being used by public health institutions.[22] The number of "recoveries" has been described by health professionals as a metric that "really doesn't help us make decisions about what precautions communities need to take, or really how prevalent in the community COVID is."[23]

When accounting for both positive and "recovered" prisoners, as of June 1,

---

https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html

[20] Janene Scully, *Hundreds Rally to Protest Plight of Inmates at Coronavirus-Riddled Lompoc Prison*, SAN LUIS OBISPO TRIBUNE (May 26, 2020) https://www.sanluisobispo.com/news/coronavirus/article242994501.html

[21] *See e.g.* Rim Decl. Exh. L (Samra Decl. ¶ 15).

[22] Marfin, *supra*, available at https://www.dallasnews.com/news/public-health/2020/05/19/why-arent-coronavirus-recoveries-always-reported/?outputType=amp

[23] *Id*.

2020, BOP reports:

- 900 cases out of 949 prisoners at FCI Lompoc—*nearly a 100% rate of infection*; and

- 176 cases out of 1677 prisoners at USP Lompoc, which has not yet undergone a round of mass testing.

In total, even with only one of the two facilities tested, 1,065 out of the 2,626 individuals incarcerated at Lompoc have recently tested positive for coronavirus.[24] Three prisoners have died already. The numbers are clear: Lompoc has utterly failed to protect the prisoners in its care from COVID-19.

At this point in the COVID-19 pandemic, the substantial danger posed by COVID-19 is well-known. COVID-19 causes serious illness, with overall case fatality rates in the United States so far estimated at 5.8%.[25] Approximately 20% of those who are infected and develop symptoms require significant medical intervention.[26] The condition of patients who require hospitalization often deteriorates in rapid fashion. For instance, approximately 50% develop hypoxemia (severe oxygen shortage) by the eighth day.[27] Twenty-nine percent develop Acute Respiratory Distress Syndrome ("ARDS"). ARDS, lethal on its own, also causes fatal complications such as blood clots, collapsed lung, infections and scarring of lung tissue.[28]

The effects of COVID-19 are especially serious for people who are most vulnerable, including people over the age of 50, and those of any age with

---

[24] *See* Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed June 1, 2020).

[25] Rim Decl. Exh. L (Samra Decl. ¶ 6.)

[26] *Id.*

[27] *Id.*

[28] *Id.*

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

underlying health conditions, including weakened immune systems, asthma, hypertension, diabetes, serious heart and lung disease.[29] Although individuals in these categories are most vulnerable, even younger and healthier people can suffer severe consequences.[30] For example, adults age 20-44 account for 20% of all hospitalizations and 12% of ICU admissions.[31] Even healthier people who contract COVID-19 are susceptible to severe strokes.[32] For some, the stroke is even the first symptom of COVID-19.[33] In fact, preliminary evidence suggests COVID-19 may render lasting organ damage in even minimally symptomatic or completely asymptomatic patients.[34] Importantly, COVID-19 is a novel illness, and doctors and

[29] While the CDC typically classifies only people 65 and older as vulnerable, incarcerated individuals tend to be in poorer health than those in the general population, justifying the use of an earlier cutoff in classifying people deemed vulnerable. Rim Decl. Exh. K ¶ 8. The CDC itself acknowledges that incarcerated individuals are in poorer health than the general population, even at a younger age. *See also* Rim Decl. Exh. C (Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities) at 16 ("Note that incarcerated/detained populations have higher prevalence of infectious and chronic diseases and are in poorer health than the general population, even at younger ages.") *See also* Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/defaultsource/coronaviruse/whochina-joint-mission-on-covid-19-final-report.pdf (hereinafter "WHO-China Joint Mission Report") ("Individuals at highest risk for severe disease and death include people aged over 60 years and those with underlying conditions such as hypertension, diabetes, cardiovascular disease, chronic respiratory disease and cancer.")

[30] Rim Decl. Exh. L (Samra Decl. ¶ 9).

[31] *Id.*

[32] *Id.*

[33] Roni Caryn Rabin, *Coronavirus May Pose a New Risk to Younger Patients: Strokes*, NEW YORK TIMES (May 14, 2020), https://www.nytimes.com/2020/05/14/health/coronavirus-strokes.html

[34] *Id.* (describing the way that COVID-19 can severely damage lung tissues, which

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1   epidemiologists are continuing to learn about new symptoms and complications.

2       **B.    Lompoc Is Not Properly Testing, Treating, or Isolating the Named**

3              **Petitioners.**

4       Lompoc is one of the few BOP facilities that has made the unusual decision to

5   severely restrict access to phone and email for prisoners under the guise of

6   preventing the spread of the virus. Since this lawsuit was filed, and despite repeated

7   inquiries to both Lompoc staff and counsel for Respondents, counsel for Petitioners

8   still have been unable to get a legal call with any of the named Petitioners except

9   one.[35] But the limited information that has been provided by family members and

10  individual counsel for the named Petitioners paints a disturbing picture of a prison

11  that is unwilling or unable to test, treat, or isolate people properly while

12  simultaneously refusing to even consider releasing medically vulnerable, non-

13  violent prisoners who have a viable release plan into home confinement.

14      Petitioner Torres is incarcerated at USP Lompoc. His frightening experience

15  indicates that USP Lompoc is still not testing prisoners unless they are already in

16  serious danger. As previously discussed, when Petitioner Torres, who is known to

17  have asthma, reported symptoms consistent with coronavirus, he was ignored for

18  days and denied medical treatment until he went into respiratory shock and had to be

19  put on a ventilator. Only then was he given a COVID-19 test, which came back

20  positive. Petitioner Torres's family has submitted a submitted a request for

21  compassionate release on his behalf to the Warden of Lompoc on May 11, 2020, and

22

23

24  in some case can cause a permanent loss of respiratory capacity, and target the heart

25  muscle causing a condition known as myocarditis, or inflammation of the heart
    muscle, which can lead to rapid or abnormal heart rhythms in the short term and

26  long-term heart failure that limits exercise tolerance and the ability to work.)

27  [35] Declaration of Jimmy Threatt ("Threatt Decl.") ¶ 2.

28

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1   to date, they have not received a response.[36]

2        Petitioner Reed is also incarcerated at USP Lompoc. He is 53 years old and

3   has hypertension, making him especially vulnerable to complications resulting from

4   COVID-19. Petitioner Reed's son has juvenile diabetes, is fully blind, and was

5   recently diagnosed with kidney failure at the age of 30. Petitioner Reed may be the

6   only viable candidate to donate a kidney to his son. Around March 27 or 28, 2020,

7   Petitioner Reed began developing symptoms of COVID-19. On March 30, 2020, he

8   was tested and immediately put into solitary confinement. After Petitioner Reed's

9   results came back positive, he was left in solitary confinement for days and then

10   transferred to an old and unsanitary housing unit where—along with others who had

11   tested positive—he languished without treatment. On April 14, 2020, Mr. Reed was

12   returned to the general population. He was not tested again for COVID-19 prior to

13   his return. Petitioner Reed submitted a request for compassionate release/reduction

14   in sentence to the Warden of Lompoc on January 7, 2020. His request was

15   rejected.[37]

16        Petitioner Brown is incarcerated at USP Lompoc. He is 55 years old, illiterate,

17   and has learning disabilities. Because Petitioner Brown is illiterate, the

18   communications blackout at Lompoc, which severely restricts access to phone and

19   email for prisoners, has functionally cut him off from the outside world. His

20   conviction is currently under appeal with the Ninth Circuit Court of Appeals, with

21   argument expected in late 2020. Petitioner Brown has prostate cancer that must be

22   treated with chemotherapy or surgery. He is also asthmatic, suffers from high blood

23   pressure, and has arthritis in both wrists. Through counsel, Petitioner Brown

24   submitted a request for compassionate release to the Warden of Lompoc on May 13,

25

26   [36]  Rim Decl. Exh. F (Carror Decl.).

27   [37]  Rim Decl. Exh. G (Declaration of Joanna Munson Perales ("Perales Decl.")).

28

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

2020. He has not received a response.[38]

Petitioner Garcia was incarcerated at FCI Lompoc under recently, when he was abruptly moved to a makeshift cell block set up in a warehouse at USP Lompoc after testing negative for COVID-19. There, he sits in a small cell with one other prisoner, under total lockdown almost twenty-four hours a day. He is not allowed to shower or change into clean clothes, and has been forced to wet his body with water from his sink in a last resort to maintain personal hygiene. He is 36 years old and set to be transferred to a "halfway house" on July 7, 2020, and released from custody on November 6, 2020. Given his coming release date, Petitioner Garcia submitted an application for Compassionate Release and/or Home Confinement to the Warden of Lompoc on May 11, 2020, but he has not yet received a response.[39]

Petitioner Fears is 50 years old and incarcerated at a minimum security satellite camp at USP Lompoc. Petitioner Fears lives in a crowded open-plan dormitory with more than a hundred other prisoners, many of whom are sick. He is relying only on a single mask given to him in late April to protect him from infection. Over a month after the outbreak at Lompoc started, he has still not been tested for COVID-19. Guards have stopped accepting requests for medical treatment from others in his dormitory, and those who typically receive regular medical treatment are no longer receiving it.[40] Petitioner Fears submitted an application for Compassionate Release and/or Home Confinement to the Warden of Lompoc on April 12, 2020,, but has not yet been granted release.[41]

---

[38] Rim Decl. Exh. I (Declaration of Verna Wefald ("Wefald Decl.")).

[39] Rim Decl. Exh. H (Declaration of Graciela Zavala-Garcia ("Zavala-Garcia Decl.")).

[40] Rim Decl. Exh. J (Declaration of Nema Zayed Fears ("Fears Decl.")).

[41] Threatt Decl. ¶ 18.

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

**C.** **Lompoc Refuses to Implement Essential Measures to Protect Prisoners and Mitigate the Spread of COVID-19**

**1.** **Rather Than Using Their Power to Release At-Risk Prisoners and Reduce Overcrowding, Respondents Moved People Into Other Unsanitary Spaces**

Beginning as early as March 12, 2020, California Governor Gavin Newsom informed the public that physical distancing was critical to prevent the spread of COVID-19 and instructed people to remain six feet apart from one another.[42] But the Governor's recommendation fell on deaf ears at Lompoc. With a designated capacity of 2,058, Lompoc's current population of 2,626 prisoners makes it overcrowded by 130%.[43] Unsurprisingly, without a reduction in prison population, prisoners at Lompoc have not been able to maintain six-feet of physical difference. There are a variety of housing arrangements at Lompoc. According to Petitioner Fears, many low security prisoners at Lompoc and the camps at USP Lompoc reside in open plan dorms with as many as 160 other prisoners in the same room, assigned to bunkbeds that are not separated by walls, with no more than two to four feet between the bunks.[44] Richard Lumpkin, who was recently released from FCI Lompoc, states that most dorms have 70 to 80 prisoners and are on the same floor as approximately 16 unlocked cells that house between 4 to 8 people per cell. The prisoners in both the dorm and the cells on the same floor share one of two

---

[42] Bostock, Bill, *California Banned Gatherings of 250 or More and Said Smaller Ones Should Only Happen if People Stand Six Feet Apart*, Business Insider, March 12, 2020, https://www.businessinsider.com/california-bans-gatherings-250-prevent-coronavirus-six-foot-spacing-rule-2020-3

[43] Federal Bureau of Prisons, Prison Rape Elimination Act (PREA) Audit Report, June 12, 2018, https://www.bop.gov/locations/institutions/lof/prea_lof.pdf at 2, 6.

[44] Threatt Decl. ¶ 18; Rim Decl. Exh. P (Declaration of Richard Lumpkin ("Lumpkin Decl.")) ¶¶ 8-9.

bathrooms with six sinks, six toilets, three urinals, and five or six showers.[45] Even in the cells, it is impossible to maintain social distancing—Mr. Lumpkin was one of four people in an eight-person cell and reports that when he had to stand up for daily count, he was shoulder to shoulder with his other cellmates.[46]

The accounts of Respondents' attempts to "socially distance" prisoners without reducing the population are appalling. It appears that those who test positive are initially thrown into the SHU, where they were not given any medical treatment for days.[47] After a few days, the infected prisoners are crammed into an isolation dormitory with other sick prisoners, where again their symptoms go largely ignored part from inconsistent temperature checks.[48] The isolation dormitory is appallingly unsanitary—it was closed three years ago due to mold contamination and was not cleaned before the sick prisoners were placed there. The isolation dormitory is empty apart from a few mattresses that were brought in by the guards.[49] Some of those who test negative have been moved into two-person cells in a makeshift housing unit set up in a warehouse at USP Lompoc.[50] Prisoners in the warehouse cells share a sink and a toilet and are kept on total lockdown for nearly twenty four hours a day, without access to showers or clean clothes.[51] Still others, particularly remain in open-plan dormitories and without being tested at all and are

---

[45] Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 9-11).

[46] *Id*. ¶ 12.

[47] Rim Decl. Exh. G (Perales Decl. ¶ 6)..

[48] Rim Decl. Exh. G (Perales Decl. ¶ 7); Rim Decl. Exh. S (Hemmelgarn Decl. ¶ 3) (prisoner Hemmelgarn never received temperature check).

[49] Rim Decl. Exh. G (Perales Decl. ¶ 7).

[50] *Id*.

[51] Rim Decl. Exh. H (Zavala-Garcia Decl. ¶ 5).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

forced to share a space with many other sick people, unable to protect themselves from infection.[52]

Even now, after nearly 100% of Lompoc FCI prisoners have tested positive, and three prisoners across both facilities have died, prisoners are forced to wait in lines to pick up medication and are not able to practice physical distancing while in line.[53] Prisoners are required to clean their own shared bathrooms and housing units but are not given sufficient supplies to do so. When Mr. Lumpkin was still in custody, he recalls one time where the guards brought 36 rags to be used by all 140 prisoners on his floor to clean their bunks, bathroom faucets, and toilet handles. Respondents only provide heavily watered-down disinfectant, which frequently runs out, and no paper towels.[54] In such close, unsanitary quarters, it is indisputable that prisoners will continue to fall ill on a daily basis. Once they become ill it goes without saying that they must be provided treatment.

**2.      Respondents Ignored CDC-Issued Guidance for Managing the Virus in Correctional Facilities.**

Early on, the Center for Disease Control recognized that correctional facilities like Lompoc are incubators and amplifiers for an infectious disease like COVID-19.[55] The virus is extremely contagious; its spreads from person-to-person through

---

[52] Rim Decl. Exh. J (Fears Decl. ¶ 4); Exh. K (Declaration of Darwin P. Roberts ("Roberts Decl.") ¶ 8).

[53] Rim Decl. Exh. P (Lumpkin Decl. ¶ 13.).

[54] *Id*. ¶ 38.

[55] Rim Decl. Exh. B at 13 ("Correctional and detention facilities can include custody, housing, education, recreation healthcare, food service and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors.")

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

respiratory droplets emitted when coughing and sneezing, or even through heavy breathing activities, like yelling and singing.[56] It also spreads through contact with contaminated surfaces and objects, where the virus can survive up to three days.[57] Given that prisoners experience their daily lives in close quarters, have limited access to daily hygiene resources, and are in worse health overall than the general population, COVID-19 poses enhanced risks to prisoners.[58]

To address this enhanced risk, the federal government provided correctional institutions with guidance on how to address these challenges. On March 23, 2020, the Center for Disease Control and Prevention ("CDC") issued "Interim Guidance on Management of Coronavirus Disease (COVID-19) in Correctional and Detention Facilities" ("Interim Guidance"), which describes measures necessary to prevent the spread of COVID-19 in correctional facilities.[59] These guidelines include: diagnosing, isolating, and caring for those with COVID-19; implementing quarantine of prisoners or staff who have had close contact with positive cases; remediating spaces with known coronavirus contact; enacting stricter sanitation policies; providing personal protective equipment ("PPE") to those who have tested positive and guards who interact with them; and implementing effective social distancing measures.[60] As the CDC explained, "[c]onsistent application of specific preparation, prevention, and management measures can help reduce the risk of

---

[56] Rim Decl. Exh. L (Samra Decl.) ¶ 4.

[57] National Institutes of Health, New Coronavirus Stable for Hours on Surfaces, March 17, 2020, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces

[58] Rim Decl. Exh. B at 13.

[59] Rim Decl. Exh. B.

[60] *Id.*

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1  transmission and severe disease from COVID-19."[61]

2  But Respondents have failed and refused to consistently apply the CDC

3  guidance at Lompoc. To the contrary, Respondents spurned the guidance and

4  profoundly and pervasively failed to protect the health and safety of the incarcerated

5  individuals in their care at Lompoc. Respondents' failure to follow CDC guidance

6  breaks down into four general categories: (1) Failure to adequately implement

7  social distancing measures; (2) Failure to implement necessary hygiene measures

8  and provide appropriate PPE; (3) Failure to adequately test, trace and

9  quarantine/isolate; and (4) Failure to provide adequate medical monitoring and

10  treatment. For each category, a chart below compares the relevant CDC guidance

11  with Respondents' inadequate actions or improper inaction.

12  **1. Failure to adequately implement social/physical distancing measures:**

| CDC Guidance | Lompoc's Improper Response |
|---|---|
| Social distancing "is a cornerstone of reducing transmission of respiratory diseases such as COVID-19. Corrections facilities must "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of the presence of symptoms).[62] | Prisoners who have tested positive have been crammed together in an open-plan isolation dormitory infested with mold.[63] Hundreds of prisoners at USP Lompoc who remain untested continue to reside in open-plan dormitories where they sleep in beds spaced two to four feet away from other prisoners,[64] many of whom are obviously sick.[64] Social distancing is impossible when moving through the stairs and standing in line for meals and pill call.[65] |

**2. Failure to implement necessary hygiene measures and provide**

---

[61]  Rim Decl. Exh. B at 13.

[62]  Rim Decl. Exh. B at 15.

[63]  Rim Decl. Exh. G (Perales Decl. ¶ 7).

[64]  Threatt Decl. ¶ 18; Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 8-9).

[65]  Threatt Decl. ¶ 18; Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 13, 15).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

appropriate PPE

| CDC Guidance | Lompoc Response |
|---|---|
| Prisoners should be provided with "undiluted disinfectants," which are necessary to actually kill the virus on surfaces[66] | Respondents provided prisoners with heavily watered-down solutions and a few rags to apply the useless disinfectant.[67] Prisoners frequently run out of cleaning solution and have nothing to clean with. Petitioners simply do not have access to the cleaning supplies necessary to sanitize themselves, their personal items or their living areas. |
| Confirmed or suspected cases of COVID-19 should wear face masks at all times. Corrections institutions should "[p]rovide clean masks as needed. Masks should be changed at least daily, and when visibly soiled or wet."[68] | Prisoners were initially given 1 paper mask in early April and then 3 cloth masks at the end April. They were told to launder and reuse the dirty masks, but they are not given enough soap to even shower, much less clean masks.[69] |
| Staff having direct contact with confirmed or suspected cases must wear face masks and other PPE.[70] | In the BOP union's OSHA complaint, Lompoc is listed as one of the prisons were staff have not been provided with adequate personal protective equipment ("PPE"), including n95 masks.[71] Staff do not wear masks regularly and frequently pull them down when talking to prisoners.[72] If a guard without a mask contracts the virus from a sick prisoner, he could spread COVID-19 by visiting units with healthy prisoners. |

[66]  Rim Decl. Exh. B at 20.

[67]  Threatt Decl. ¶ 18; Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 38).

[68]  Rim Decl. Exh. B at 26.

[69]  Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 34-35).

[70]  Rim Decl. Exh. B at 27.

[71]  Russell, *supra*, *available at* https://fcw.com/articles/2020/04/07/afge-osha-complaints-covid19.aspx

[72]  Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 34-35).

### 3. Failure to adequately test, trace and quarantine/isolate

| CDC Guidance | Lompoc Response |
|---|---|
| The CDC instructs prisons "not [to] cohort confirmed cases with suspected cases or contact cases."[73] | USP Lompoc is unable to segregate cases because they are not conducting testing and simply allowing potentially sick prisoners to share open dorms with healthy ones. As for FCI Lompoc, in a belated effort to segregate the infected population, Respondents are moving inmates back and forth between housing units, transferring them from one place to another when they are sick, and then either sending them back or transferring them to yet another place when they are deemed "recovered." Prisoners are not re-tested and confirmed to be negative before being returned to housing units meant to be populated with non-infected prisoners, a practice Dr. Samra explicitly cites as "problematic."[74] |
| Individuals who have had close contact with a COVID-19 case should be quarantined, ideally in a single cell, for 14 days to determine whether they develop symptoms.[75] The quarantined individual should be monitored for symptoms two times per day for 14 days.[76] | When a sick person is removed from a dorm, the people who were in close contact with that person are not quarantined and are instead left in the shared space.[77] |
| For prisoners who test positive for COVID-19, the CDC recommends that they be isolated. If the number of confirmed cases exceeds the number of individual medical isolation spaces in the facility, prisons need to be | While Respondents appear to have attempted to isolate positive prisoners in early April by throwing them into solitary without medical treatment,[79] as of May, prisoners who tested positive are not being isolated from other |

---

[73] *See* Rim Decl. Exh. B at 27.

[74] Rim Decl. Exh. G (Perales Decl. ¶ 9); Exh. L (Samra Decl. ¶ 16).

[75] *See* Rim Decl. Exh. B at 30.

[76] *Id*. at 22.

[77] Rim Decl. Exh. P (Lumpkin Decl. ¶ 27).

[79] Rim Decl. Exh. G (Perales Decl. ¶ 6)

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

especially mindful of cases who are at higher risk of severe illness from COVID-19, who should ideally not be cohorted with other infected individuals, and if cohorting is unavoidable, should be allocated more space for higher risk individuals within a shared medical isolation space.[78]

prisoners even if they have symptoms.[80] Prisoner Charles Cheatham, who could not get in touch with his counsel in time to confirm whether he wanted to be a named Petitioner to this action, indicates that he was sick and tested positive but continued to be housed in a dorm with 100 other prisoners, most of whom now also have COVID-19.

### 4. Failure to provide adequate medical monitoring and treatment

**CDC Guidance**

Facilities "should ensure that incarcerated individuals receive medical evaluation and treatment at the first sign of COVID-19 symptoms."[81]

**Lompoc Response**

Lompoc is so overwhelmed that medical care is now "limited or nonexistent[,]"[82] and prisoners with COVID-19 are not tested or treated until they hit "rock bottom."[83] Even prisoners who have fever or severe coughing are not being provided medical treatment unless they have a temperature higher than 100.4 degrees.[84] As the Court is by now familiar, Petitioner Torres was suffering from fever, diarrhea, and body aches but was ignored for five days and denied medical treatment until he collapsed in his cell.[85] Petitioner Fears has experienced chills, body aches, and a dry cough but has still never been tested or consulted with a doctor.[86] Prisoner Mohammed Yusuf was left for four days while seriously ill until he

---

[78] Rim Decl. Exh. B at 27, 30.

[80] Rim Decl. Exh. K (Roberts Decl. ¶ 7).

[81] Rim Decl. Exh. B at 34.

[82] Rim Decl. Exh. K (Roberts Decl. ¶ 7).

[83] Rim Decl. Exh. F (Carror Decl. ¶ 10).

[84] Rim Decl. Exh. P (Lumpkin Decl. ¶ 27).

[85] Rim Decl. Exh. F (Carror Decl. ¶ 6).

[86] Threatt Decl. ¶ 18.

3651124

Patients with risk factors for severe illness should be monitored closely given the risk of progression to severe illness in the second week after symptom onset.[89] Importantly, if the facility is not able to provide such evaluation and treatment, the CDC's guidance does not permit abdicating these functions. Instead, the CDC recommends that a plan should be in place to safely transfer the prisoner to another facility or local hospital.[90]

collapsed and died in the dormitory.[87] Prisoners are even unable to obtain basic treatment such as acetaminophen for fever.[88]

Petitioner Fears reports that those in his unit are not receiving routine medical treatment, and officials have stopped accepting requests for medical care.[91] As a result, people like Petitioner Brown—who requires chemotherapy or surgery to treat his prostate cancer—and others similarly situated have been rendered unable to obtain the care they need.[92]

Without adequate medical attention, some prisoners have become gravely ill, including Petitioner Torres, who was not monitored or even given treatment for days after he developed full blown symptoms despite having chronic asthma, a well-known COVID-19 risk factor.[93]

Respondents have also ignored CDC guidance aimed at promoting mental health during a stressful period in prisoner's lives. Specifically, the CDC also recommended that correctional facilities "consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from

---

[87] Rim Decl. Exh. S (Hemmelgarn Decl. ¶ 5).

[88] *Id.* ¶ 3 (Prisoner Adam Hemmelgarn has a terrible fever for 3 to 4 days after he tested positive, but the prison gave him no medical care, he was left to suffer through it.)

[89] Rim Decl. Exh. B at 34.

[90] *See id.*

[91] Threatt Decl. ¶ 18.

[92] Rim Decl. Exh. I (Wefald Decl. ¶ 6).

[93] Rim Decl. Exh. F (Carror Decl. ¶¶ 5-7).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

direct contact with community visitors."[94] Instead of increasing telephone privileges, Lompoc eliminated it.[95] Lompoc also prohibited using computers and email. When inmates were sick and scared, they were unable to reach out and speak to a loved one and instead faced the stress of a public health crisis on their own.[96] This puzzling decision stands in stark contrast to the actions of the California state prison system, which has instead partnered with a telephone provider to offer incarcerated people increased periods of *free phone unlimited calls* during this trying time.[97]

In short, Respondents disregarded nearly every CDC guideline for controlling and managing COVID-19 at correctional facilities and refused to make necessary changes to protect prisoners. One of the only changes they made – cutting off almost all communication with the outside world – had negative impacts on the prisoners' mental health and therefore was not part of the CDC's recommendations. This change was not based on science, nor is it a uniform practice instituted in other detention facilities—it is clearly an attempt to insulate Lompoc from discovery of its failures, Respondents' consistent repudiation of scientific expertise has resulted in 1,065 prisoners contracting COVID-19 and 3 people dying.

---

[94] Rim Decl. Exh. B at 24.

[95] Clair Hymes, *No Phone or Email for Nearly 4,000 Inmates at Three Federal Prisons in Effort to Fight Virus* CBS News, May 1, 2020, https://www.cbsnews.com/news/coronavirus-no-phone-email-inmates-federal-prisons-california-lompoc-terminal-island/

[96] Rim Decl. Exh. F (Carror Decl. ¶ 3); Exh. H (Garica Decl. ¶ 3); Exh. J (Fears Decl. ¶ 3).

[97] California Department of Corrections and Rehabilitation, *COVID-19 Response Efforts*, https://www.cdcr.ca.gov/covid19/covid-19-response-efforts/#VCMP (last accessed June 1, 2020)

### 3. Respondents defied Attorney General Barr's direction to "immediately maximize appropriate transfers" to home confinement

Respondents also ignored explicit powers granted to them by Congress and directions by Attorney General Barr to reduce the density of the prison population to protect prisoners and the public from COVID-19. On March 26, 2020, prior to the passage of the CARES Act, Attorney General William Barr directed the BOP to prioritize the use of "various statutory authorities to grant home confinement for prisoners seeking transfer in connection with the COVID-19 pandemic" because "for some eligible inmates, home confinement might be more effective in protecting their health."[98] He identified the standard discretionary factors for consideration, including (1) "[t]he age and vulnerability of the prisoner to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," and (2) "the security level of the facility," with "priority given" to prisoners incarcerated "in low and medium security facilities."[99] Many prisoners at Lompoc squarely qualified for consideration because Lompoc is low security and, as a category 3 care facility, houses many medically vulnerable prisoners.

The next day, on March 27, 2020, Congress enacted the CARES Act (P.L. 116-136). Among other things, the CARES Act authorizes the Director of the BOP to lengthen the maximum amount of time that a prisoner may be placed on home confinement when the Attorney General "finds that emergency conditions will materially affect the functioning" of BOP. In the wake of the reported deaths of several prisoners incarcerated at FCI Oakdale, FCI, Danbury, and FCI Elkton,

---

[98] Rim Decl. Exh. C (Memorandum For Director of Bureau of Prisons re Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic, Office of the Attorney General, Washington, D.C. (Mar. 26, 2020)) at 39.

[99] *Id.*

Attorney General Barr made quick use of his authority under the CARES Act to enable BOP to start exercising its broadened discretion, issuing a memo on April 3, 2020, in which he made the requisite finding that "emergency conditions are materially affecting the functioning of the Bureau."[100] The memo explained that the Bureau of Prisons was "experiencing significant levels of infection at several of our facilities."[101] Noting the Bureau's "profound obligation to protect the health and safety of all inmates," Attorney General Barr directed the Bureau to "move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions."[102]

Reflecting the urgency of the situation, Attorney General Barr's memo directed *immediate action*. He directed prison officials to "immediately review all inmates who have COVID-19 risk factors, as established by the CDC," to "immediately maximize appropriate transfers," and to "begin implementing this directive immediately."[103] The Attorney General made clear that the review was to include "*all at-risk inmates, not only those who were previously eligible for transfer.*"[104] Critically, he noted that, "[g]iven the speed with which this disease has spread through the general public, it is clear that time is of the essence," and directed the Bureau to "implement this Memorandum as quickly as possible . . . ."[105]

On April 22, the BOP issued a memo purporting to interpret Attorney General

---

[100] Rim Decl. Exh. A at 8.

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.* at 9 (emphasis added).

[105] *Id.*

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

Barr's guidance, substantially limiting the number and types of people who might qualify for home confinement under the Attorney General's memos.[106] Even though the April 3 Barr memo directed the BOP to "immediately maximize appropriate transfers to home confinement," at "outbreak prisons," including "all at-risk inmates, not only those who were previously eligible for transfer," the BOP created its own criteria that is even more restrictive than the standard criteria the Attorney General had set forth *before the passage of the CARES Act*. It is no surprise these criteria exclude the vast majority of prisoners from consideration for release. For example, pursuant to the BOP's guidance from April 22: prisoners must have had no disciplinary infractions of any kind for 12 months; and prisoners who have served 50% or more of their sentences or have 18 months or less remaining and have served 25% or more of their sentences receive priority.[107] After reports of positive cases continued to explode, on May 8, 2020, BOP amended this guidance to relax a few criteria, but it continues to be far more restrictive than the recommendations proposed by Attorney General Barr.[108]

And despite the explicit statutory authority under the CARES Act to place any prisoner in home confinement, and despite Attorney General Barr's urgent memorandum directing immediate action to review all inmates who have COVID-19 risk factors and *maximize* appropriate transfers, Respondents' use of their home confinement authority has been exceptionally *limited*. As of April 22, 2020, of the more than 2,600 prisoners at Lompoc, only 59 inmates have been considered—it is

---

[106] Rim Decl. Exh. D (Memorandum from Correctional Programs Division Acting Assistant Director Andre Matevousian & Reentry Services Division Assistant Director Hugh J. Hurwitz to Chief Executive Officers (Apr. 22, 2020).
[107] *Id*. at 43.

[108] Rim Decl. Exh. E (Memorandum from Correctional Programs Division Acting Assistant Director Andre Matevousian & Reentry Services Division Assistant Director Hugh J. Hurwitz to Chief Executive Officers (May 8, 2020)).

not clear how many, if any have actually been released.[109] At the current population levels, Lompoc has proven simply unable to follow the CDC's recommendations for isolation and physical distancing to prevent the spread of COVID-19. Given the number of prisoners at Lompoc, and the fact that large parts of Lompoc house low to minimum security prisoners who will not present a danger to the public, there is no legitimate reason that so few people are being considered for release to home confinement.[110]

It is clear that without a structured, court-supervised process for individualized consideration of each prisoner's suitability for release, Respondents will not reduce the population density at Lompoc, and COVID-19 will continue to spread until each and every inmate and staff member has contracted the virus.

### D. Lompoc Is Incapable of Providing Adequate Medical Care for COVID-19 Patients, Posing an Unconstitutional Threat Both to the Incarcerated and to the Local Community.

Providing adequate medical care in the face of an outbreak of this size would be challenging for any community. For a prison like Lompoc, it is an impossibility. The medical facilities at Lompoc consist of only "a small medical bay capable of caring for a few patients."[111] BOP claims that Lompoc's medical capabilities have

---

[109] Rim Decl. Exh. Q (Talking Points for Inmates Asking About Early Releases During COVID-19 as of 4/20/20).

[110] While not at Lompoc, it is troubling that wealthy and politically connected prisoners like Paul Manafort, who do not meet BOP-enhanced time-served thresholds for consideration are still able to obtain release, when inmates of similar age, also with underlying conditions, on even shorter sentences for non-violent crime are abandoned to die.

[111] Taylor Hayden, *Inmates and Families Panic as Lompoc Prison Goes Into Lockdown*, SANTA BARBARA INDEPENDENT, Apr. 22, 2020, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/

3651124

been supplemented with a newly-constructed Hospital Care Unit ("HCU"). In reality, the 20-bed HCU—yet another converted warehouse—has been little more than an exercise in public relations: the HCU lacks any ventilators, and is "not properly equipped to handle serious COVID-19 cases."[112] BOP has not yet actually staffed the HCU with doctors and nurses, and local health officials have remarked that as of May 8, it was "unclear whether the [HCU] is in fact operational."[113] In lieu of adequate care —rendered impossible due to a serious lack of medical resources— prison authorities at Lompoc have adopted a chilling indifference towards those affected by COVID-19.

The story of Mr. Torres is not an isolated incident but part of a larger pattern of deliberate indifference to that shocks the conscience. As discussed above, due to limited staffing and resources, medical care at Lompoc is now "limited or nonexistent[,]"[114] and prisoners with COVID-19 are not tested or treated until they hit "rock bottom."[115] Even when they test positive, they are not immediately isolated from other prisoners, sometimes being left in dormitories housing approximately 100 people for as long as 14 days.[116]

When Respondents actually identify COVID-19 patients, the treatment they provide resembles prison discipline more than medical care. On March 27 or 28, 2020, Petitioner Reed began exhibiting symptoms of COVID-19.[117] Respondents

---

[112] Taylor Hayden, *Lompoc Prison Explodes with Active COVID-19 Cases*, SANTA BARBARA INDEPENDENT, May 13, 2020, https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/.

[113] *Id.*

[114] Rim Decl. Exh. K (Roberts Decl. ¶ 7).

[115] Rim Decl. Exh. F (Carror Decl. ¶ 10).

[116] Rim Decl. Exh. K (Roberts Decl. ¶¶ 7-8).

[117] Rim Decl. Exh. G (Perales Decl. ¶ 6).

waited until March 30, 2020, to test him, and immediately placed him in solitary confinement while they awaited results.[118] On March 31, 2020, Petitioner Reed received a temperature and symptom check from a doctor.[119] After that, Respondents left him to languish in solitary confinement, and did not allow him to see a doctor again until April 7, 2020.[120] Respondents' approach of throwing people like Mr. Reed into solitary confinement when they display COVID-19 symptoms has incentivized prisoners at Lompoc to hide symptoms, even when they feel sick.[121]

As Dr. Samra notes, "the allegations" "show[] that virtually no effort is being made at Lompoc to monitor or treat prisoners, with staff waiting until the last minute to intervene," and that also has significant ripple effects on even regular medical care for prisoners with conditions unrelated to COVID-19.[122] This is precisely what is happening inside Lompoc, as prison staff have stopped accepting requests for medical care from prisoners since the outbreak started.[123] As a result, Petitioner Brown—who requires chemotherapy or surgery to treat his prostate cancer—and others similarly situated have been rendered unable to obtain the care they need to survive.[124]

---

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.* ¶ 11.

[122] Rim Decl. Exh. L (Samra Decl. ¶ 18).

[123] Rim Decl. Exh. J (Fears Decl. ¶ 7); Exh. P (Lumpkin Decl. ¶¶ 44-46).

[124] Rim Decl. Exh. I (Wefald Decl. ¶ 6).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

III.     **ARGUMENT**

    A.     **The Court Should Temporarily Enlarge Petitioners' Custody Pursuant to a Supervised, Individualized Inquiry and Require Lompoc to Provide Adequate Medical Care to COVID Positive Patients.**

A Temporary Restraining Order ("TRO") may be issued upon a showing "that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). The analysis for a TRO and a preliminary injunction is the same. *See Frontline Med. Assoc., Inc. v. Coventry Healthcare Workers Compensation, Inc.*, 620 F. Supp. 2d 1109, 1110 (C.D. Cal. 2009) ("The standard for a temporary restraining order [] and a preliminary injunction are the same.").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Ninth Circuit employs a "sliding scale" approach to *Winter's* four-element test. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Under this approach, a preliminary injunction—and, thus, a temporary restraining order—may issue if the plaintiff raises at least "serious questions going to the merits" and demonstrates that "the balance of hardship tips sharply in the plaintiff's favor," but only so long as the plaintiff also satisfies the other *Winter* factors. *Id*. A stronger showing of one element may offset a weaker showing of another. *See id.* ("a stronger showing of one element may offset a weaker showing of another."). A mandatory injunction can be issued only when the facts and law clearly favor the moving party. *Committee of Cen. Am. Refugees v. INS*, 795 F.2d 1434 (9th Cir. 1986); *Roman v. Wolf*, No. 20-cv-00768, 2020 WL 1952656, at *12 (C.D. Cal. Apr. 23, 2020) (finding that plaintiffs had demonstrated "significantly more than a mere likelihood of success on

the merits" of their claim that conditions of confinement at immigration detention center took away their ability to socially distance and remain safe from COVID-19).

A preliminary injunction is customarily granted on the basis of evidence that is less complete than what is presented at a trial on the merits. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). The Court may consider hearsay and otherwise inadmissible evidence when considering whether to issue a preliminary injunction. *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1363 (9th Cir. 1988). The Court can also take judicial notice of publicly accessible websites. *See King v. City of L.A.,* 885 F.3d 548, 555 (9th Cir. 2018).

Petitioners easily meet the standard for a TRO in this case. Petitioners have identified compelling evidence that Respondents have recklessly failed to act to control the spread of COVID-19 throughout Lompoc, resulting in one of the "worst coronavirus hotspots in the nation." *United States v. Connell,* -- F.Supp.3d. --, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020) (calling the situation "dire"); *United States v. Pippin,* No. 16-cr-0266, 2020 WL 2602140, at * 2 (W.D. Washington May 20, 2020) ("there is a catastrophic COVID-19 outbreak" at Lompoc). *United States v. Gorai,* No. 2:18-cr-220, 2020 WL 1975372, at *2 (D. Nev. Apr. 24, 2020) ("[C]ourts throughout the country have noted the obvious shortcomings in the BOP's COVID-19 Action Plan"). Respondents' shocking failure to follow the recommendations of the CDC or to reduce the population of overcrowded prisons, as Congress and the Attorney General authorized them to do, has created substantial risks to the health and lives of its prisoner population, most of whom meet the established criteria for medical vulnerability to COVID-19. Immediate action is needed to prevent additional deaths. *See Connell*, 2020 WL 2315858 at *6 (noting that "California's two United States Senators have repeatedly called on the BOP to take additional emergency measures to slow the spread of the virus at the facility.") Lompoc must decrease the number of persons held at Lompoc to allow for greater social distancing and to improve the medical care and monitoring for those who

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1   have tested positive but are not released.

2   **B.   Petitioners Are Likely To Succeed on the Merits of Their Eighth**

3             **Amendment Claims**

4        The facts and the law clearly favor Petitioners on their claim that

5   Respondents' failure to protect Lompoc prisoners from conditions of confinement

6   that exposed them to a serious, life-threatening illness violates the Eighth

7   Amendment. The Eighth Amendment protects those in detention against conditions

8   of confinement that are "very likely to cause serious illness and needless suffering."

9   *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an

10   injunction to inmates who plainly proved an unsafe, life threatening condition in

11   their prison on the ground that nothing yet had happened to them.") The law is clear

12   that when prison authorities "strip [prisoners] of virtually every means of self-

13   protection and foreclose[] their access to outside aid, [they] are not free to let the

14   state of nature take its course." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). The

15   Government cannot be "deliberately indifferent to the exposure of [prisoners] to a

16   serious communicable disease." *Helling,* 509 U.S. at 33.

17        Prison officials violate a prisoner's Eighth Amendment right to humane

18   conditions of confinement when two conditions are met. First, under the "objective"

19   component of the analysis, "the alleged deprivation must be, 'objectively,'

20   sufficiently serious." *Farmer,* 511 U.S. at 825. Second, under the "subjective"

21   component, prison officials must have acted with a "sufficiently culpable state of

22   mind," namely, "'deliberate indifference' to inmate health or safety." *Id*. at 834.

23            **1.   The Conditions at Lompoc, Combined with the Risks Posed**

24                **by COVID-19, Create a Serious Medical Need**

25        To establish the "objective" element of an Eighth Amendment violation

26   "based on a failure to prevent harm, the inmate must show that he is incarcerated

27   under conditions posing a substantial risk of serious harm." *See Farmer,* 511 U.S. at

28   834. This standard is easily met here. Courts have routinely found that exposure to

3651124

1  disease or health issues constitutes a serious harm. *See, e.g., Helling*, 509 U.S. at 33
2  (finding that the reach of the Eighth Amendment includes "exposure of inmates to a
3  serious, communicable disease"); *Jeffries v. Block*, 940 F. Supp. 1509, 1514 (C.D.
4  Cal. 1996) (agreeing that "tuberculosis is a serious contagious disease, which
5  presents a serious risk to inmate health"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d
6  Cir. 1996) ("[C]orrectional officials have an affirmative obligation to protect
7  [forcibly confined] inmates from infectious disease.").

8      Simply put, the risks of serious harm due to the COVID-19 outbreak are
9  undeniable. The disease is highly contagious and spreads rapidly in close settings—
10  it has already killed more than 100,000 people in the United States and it may cause
11  long-term organ damage even in people who present with minimal or no symptoms.
12  Lompoc itself is home to one of the worst outbreaks at a federal prison in the United
13  States. According to BOP's own numbers, nearly 100% of inmates at FCI Lompoc
14  have tested positive for COVID-19 in the past two months, and even without mass
15  testing, USP Lompoc has still reported 165 positive cases. Three prisoners have
16  already died, and presumably many more have been hospitalized. The structure of
17  the prison itself heightens the risk of transmission, since prisoners are incapable of
18  social distancing with many prisoners living in large dorms of 50 or more people,
19  and even those prisoners in cells share bathrooms with large numbers of inmates.

20      Recognizing both COVID-19's ferocious attack on the human body and its
21  extreme infectiousness, which is exacerbated in congregate settings like prisons,
22  courts across the country have found that COVID-19 specifically presents a
23  substantial risk of serious harm to prisoners. *See, e.g., Martinez-Brooks v. Easter*,
24  No. 3:20-cv-00569, 2020 WL 2405350, at *20–21 (D. Conn. May 12, 2020);
25  *Fraihat v. U.S. Immigration and Customs Enforcement,* --F.Supp.--, 2020 WL
26  1932570, at *23 (C.D. Cal. April 20, 2020); *Basank v. Decker*, No. 20-cv-2518,
27  2020 WL 1481503, at *3, 5 (S.D.N.Y. Mar. 26, 2020) (citing *United States v.*
28  *Stephens*, No. 15-cr-95 (AJN), No. 15-cr-95 (AJN), 2020 WL 1295155, at *2

(S.D.N.Y. Mar. 19, 2020) and *United States v. Garlock*, No. 18-cr-418 (VC), No. 18-cr-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)); *Cameron v. Bouchard,* ---F.Supp.3d ---, 2020 WL 2569868, *21 (E.D. Mich. May 21, 2020); *cf Connell,* 2020 WL 2315858 (finding that "the critical situation at Lompoc, combined with Connell's compromised health generally, constitute 'extraordinary and compelling' reasons justifying his immediate release."); *Pippin,* 2020 WL 2602140, at *2 (finding that "catastrophic COVID-19 outbreak" at Lompoc placed medically vulnerable prisoner's "life in jeopardy"). As in each of these cases, there can be no reasonable dispute that a substantial risk of serious harm is present here.[125]

### 2. Respondents Acted With Deliberate Indifference to the Health and Safety of COVID-19 Negative Prisoners.

Petitioners can also show that the facts and law clearly favor a finding that

---

[125] In dicta in an unpublished opinion involving a pre-trial detainee, a three-judge panel of the Ninth Circuit recently stated that to satisfy the "objective" test, there is an additional requirement that a convicted prisoner show that the condition of confinement must cause "suffering inconsistent with contemporary standards of decency." *Smith v. Washington,* 781 Fed. Appx. 595, 598 (9th Cir. 2019). Other courts in the Ninth Circuit fold this notion directly into the concept of "serious harm." *See e.g., Perez v. Cox,* 788 Fed. Appx. 438, 442 (9th Cir. 2019); *Hill v. Dexter,* No. 09-cv-778, 2010 WL 2631661, at *3 (C.D. Cal. March 2, 2010). Even if a separate such showing were required, Petitioners satisfy that here. In unprecedented actions taken in modern times, nearly every state in the United States and countries across the world shut down their economies to all but essential businesses to prevent the spread of COVID-19. Hospital administrators have warned of an impending mental health crisis in even veteran physicians working with COVID-19 patients from witnessing the devastating impact of the virus on patients. *See e.g.* Wilber, Delquinton, *Hospitals Prepare for Wave of Mental Health Disorders Among Their Workers*, LOS ANGELES TIMES (May 6, 2020), *available at* https://www.latimes.com/politics/story/2020-05-06/hospitals-prepare-for-wave-of-mental-health-disorders-among-their-workers. Clearly, failing to follow basic guidance provided by the CDC to prevent the suffering caused by exposure to COVID-19 is inconsistent with contemporary standards of decency.

Respondents have been deliberately indifferent to the health and safety of the prisoners in their care. Sentenced inmates bringing claims under the Eighth Amendment can show deliberate indifference through evidence that the respondent was "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists," that the Respondent actually "dr[ew] the inference" and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 837.

It is undeniable that Respondent Warden Milusnic and Respondent Carvajal knew of the substantial risk of serious harm posed by a COVID-19 outbreak at Lompoc. In mid-March, cities and states around the country took the extraordinary measure of completely shutting down (with the exception of essential services) in order to protect their citizens from the ghastly impact of COVID-19. On April 3— more than a month and a half ago—Attorney General Barr issued an urgent memo to the Bureau of Prisons regarding COVID-19, noting the "significant levels of infection at several of our facilities" and the "dangers that COVID-19 poses to our vulnerable inmates."[126] And, "given the pervasive daily media coverage of the pandemic, the seriousness of the threat posed by COVID-19—and the particular vulnerability of elderly individuals as well as those with certain preexisting medical conditions—are so well known that it would be implausible to suggest that prison officials are unaware of this risk." *Martinez-Brooks,* 2020 WL 2405350, at *21 (citing and quoting *Farmer*, 511 U.S. at 842 ("[A] fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")).

It is equally clear that Respondents did not take reasonable steps to protect prisoners at Lompoc from that harm because they flouted – and continue to flout –

---

[126] Rim Decl. Exh. A at 8.

3651124

1  guidance by Attorney-General Barr and the guidance provided by the CDC on the

2  key steps correctional facilities must take to address COVID-19.[127]

3        In particular, while the CDC stressed that social distancing of at least six feet

4  "is a cornerstone of reducing transmission of respiratory illnesses,"[128] Respondents

5  steadfastly refuse to implement measures that would allow for appropriate social

6  distancing. Lompoc was at more than 130% capacity and overcrowded when the

7  pandemic began. The majority of the prisoners live and sleep in a perpetual large

8  gathering – in 70 to 160-person open-plan dormitories with bunk beds separated by

9  four feet or less, with shared common bathrooms with no more than a few toilets

10  and showers. A smaller number of prisoners live in small cells, close enough to

11  touch their cellmate. It is impossible to avoid personal contact in the crowded

12  hallways. "[A]t a time when public health officials are counseling strict adherence to

13  social distancing practice, most inmates at [Lompoc] live in close contact with [at

14  least 50] other inmates, in a facility with a serious, active COVID-19 outbreak." *See*

15  *Martinez-Brooks,* 2020 WL 2405350, at *21 (discussing in context of FCI

16  Danbury); *see also Pippin,* 2020 WL 2602140, at *2 (noting that prisoner is being

17  housed at FCI Lompoc "in a dormitory with 80 other men who are spaced only two

18  to three feet from one another, making effective social distancing out of the

19  question.") (internal citations and quotations omitted).

20        Respondents may contend that they opened isolation dormitories and

21

_____

22  [127] Justice Sotamayor has suggested that to provide constitutionally adequate care of
   prisoners, prison officials may need to take steps beyond those prescribed by the

23  CDC. *See Valentine,* 590 U.S. ___ (2020), 2020 WL 249751, at *2 n.2 (May 14,

24  2020) (Mem) (Sotomayor, *J.*).

25  [128] *See also* Social Distancing, Centers for Disease Control and Prevention, April

26  15, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-
   distancing.html ("Limiting face-to-face contact with others is the best way to reduce

27  the spread of [COVID-19]," including staying at least 6 feet from other people and

28  avoiding group gatherings.).

3651124

46

warehouses as makeshift living spaces to allow for social distancing. But these moves were window dressing—undertaken solely so that officials could say they did something, without actually achieving a change in the conditions that spread the virus. These so-called "isolation" and "quarantine" measures were meaningless without actually reducing the prison population. Worse, the makeshift housing spaces were unsanitary, infested with mold, and did nothing to prevent nearly 100% of FCI Lompoc prisoners from becoming infected. At this point, so many people are infected that Lompoc has given up on removing symptomatic prisoners who have tested positive from open dorms.[129]

Respondents compounded the problems caused by overcrowding by refusing to heed the CDC's recommendations for contract tracing, quarantining, and isolating confirmed and suspected cases of COVID-19. The CDC recommends that all individuals who have had close contact with a COVID-19 case be quarantined for 14 days, ideally in a single cell, and anyone with a confirmed or suspected case should be isolated to prevent contact with others.[130] Due to Respondents' inadequate testing policies, their isolation strategy has been rendered completely ineffectual. Over a month since its outbreak initially started, Lompoc *still* does not have the capacity to fully test its entire population.[131] Instead, Respondents do not test prisoners at USP Lompoc until they display symptoms,[132] and sometimes not until several days after that, when their health has already deteriorated

---

[129] Rim Decl. Exh. K (Roberts Decl. ¶¶ 7-8).

[130] Rim Decl. Exh. B at 14-15.

[131] Taylor Hadsen, *Lompoc Prison Explodes with Active COVID-19 Cases*, SANTA BARBARA INDEPENDENT, May 13, 2020, https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/.

[132] Rim Decl. Exh. G (Perales Decl. ¶ 6).

3651124

precitously.[133] In addition, prisoners are not re-tested and confirmed to be negative before being returned to housing units meant to be populated with non-infected prisoners, a practice Dr. Samra explicitly cites as "problematic."[134]

Infected individuals can spread COVID-19 even when they are completely asymptomatic.[135] As a result, the lack of asymptomatic testing and re-entry testing means that Lompoc is likely allowing infected prisoners to remain with healthy populations and spread the virus, and then allowing prisoners who are not fully recovered but asymptomatic to return to those populations and spread the virus again. In a belated effort to segregate Lompoc's infected population from its healthy and recovered population, Respondents are moving inmates back and forth between housing units, transferring them from one place to another when they are sick, and then either sending them back or transferring them to yet another place when they are deemed "recovered." This heavy-handed isolation strategy has simply resulted in a large numbers of prisoners moving from minimum and low security dormitories to temporary housing units and prison cells—it has not done anything to prevent the spread of the virus.

Given the close contact between healthy and sick prisoners at Lompoc, it is especially imperative that prison officials clean and disinfect living spaces, common spaces and bathrooms frequently and make appropriate use of PPE to reduce the spread of COVID-19. But Respondents also defied CDC guidelines with respect to sanitation and PPE. Respondents continue to provide prisoners with insufficient quantities of diluted disinfectants and a few rags that make it impossible to adequately rid living spaces of the virus.[136] CDC guidance also requires confirmed

[133] Rim Decl. Exh. F (Carror Decl. ¶ 8).

[134] Rim Decl. Exh. G (Perales Decl. ¶ 9); Exh. L (Samra Decl. ¶ 16).

[135] Rim Decl. Exh. L (Samra Decl. ¶ 16).

[136] Threatt Decl. ¶ 18; Rim Decl. Exh. P (Lumpkin Decl. ¶ 38.)

1 or suspected COVID-19 cases in congregate living spaces to wear face masks at all

2 times and instructs that masks should be changed at least *daily*. To date, prisoners

3 have been issued only three cloth masks total, and they do not even have enough

4 soap to launder them.[137] That means that prisoners must reuse dirty masks, which is

5 problematic since the virus can last on cloth masks for two days.[138] Significantly,

6 guards were not provided with PPE until late in the outbreak and even now, not all

7 guards wear masks.[139] The failure to ensure that all guards wear their masks puts

8 both guard and prisoners at heightened risk of exposure.

9     Finally, Respondents' failure to transfer medically vulnerable prisoners from

10 Lompoc to home confinement in any meaningful numbers evidences deliberate

11 indifference. On April 3, Attorney General Barr explicitly directed Respondents to

12 "immediately review all inmates who have COVID-19 risk factors, as established by

13 the CDC," to "immediately maximize appropriate transfers."[140] Attorney General

14 Barr further directed that these actions be taken "as quickly as possible,"

15 emphasizing that time is of the essence. But Respondents failed to follow these

16 directions. They have only considered 59 of more than 2,600 prisoners for home

17 confinement.[141] Even medically vulnerable prisoners with established, stable plans

20 [137] Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 34-35.)

21 [138] Healthline, How Long Does the Coronavirus Live on Different Surfaces?,
22 https://www.healthline.com/health/how-long-does-coronavirus-last-on-surfaces#shoes-and-clothing (last accessed June 1, 2020).

24 [139] Russell, *supra*, *available at* https://fcw.com/articles/2020/04/07/afge-osha-complaints-covid19.aspx; Rim Decl. Exh. P (Lumpkin Decl. ¶¶ 34-35.)

25 [140] Rim Decl. Exh. A at 8.

27 [141] Rim Decl. Exh. Q (Talking Points for Inmates Asking About Early Releases During COVID-19 as of 4/20/20).

1   for home confinement, have not been able to secure release.[142]  As one judge

2   explained, paltry grants of home confinement demonstrate that Respondents are

3   "thumbing their nose at their authority to authorize home confinement." *Wilson v.*

4   *Williams,* 2020 WL 2542131, at *3-4 (N.D. Ohio May 19, 2020) (discussing in

5   context of FCI Elkton).  It is clear that Respondents are simply ignoring the tools in

6   their possession that, if utilized, would protect the released medically vulnerable

7   prisoners, reduce the density of the prisoner population, and allow for better

8   physical distancing and other preventative measures, as well as better medical care

9   and treatment for the inmates that remain.[143]

10          Respondents' wholesale refusal and failure to follow accepted medical

11  protocol and legal guidance, particularly in the face of positive cases, amounts to

12  deliberate indifference under well-settled law. See, e.g., *Hernandez v. County of*

13  *Monterey*, 110 F. Supp. 3d 929, 943 (N.D. Cal. 2015) (stating that "known

14  noncompliance with generally accepted guidelines for inmate health strongly

15  indicates deliberate indifference to a substantial risk of serious harm"); *Cameron,*

16  2020 WL 1929876, at *2, *modified on other grounds on motion for reconsideration*,

17  2020 WL 1952836, (Apr. 23, 2020). (preliminarily finding deliberate indifference in

18  violation of the Eighth Amendment when jail "has not imposed even the most basic

19  safety measures recommended by health experts, the Centers for Disease Control

20  and Prevention, and Michigan's Governor to reduce the spread of COVID-19 in

21  detention facilities").  Indeed, a failure by a prison to implement safety and hygiene

22

23  [142] Rim Decl. Rim Decl. Exh. F (Carror Decl.¶ 12).; Exh. I (Wefald Decl. ¶ 8).

24  [143] Significantly, the deleterious health impacts of Respondents' failures reach

25  beyond just the virus itself because, since the outbreak began, medically vulnerable

26  prisoners have experienced significant delays in receiving treatment for any
    conditions that are not COVID-19. *See also Connell,* 2020 WL 2315858 at *6

27  ("Connell is unlikely to be able to get the medical care he needs at Lompoc in the
    midst of a pandemic.")

28

3651124

procedures in the face of an infectious disease outbreak is a classic example of deliberate indifference violating the Eighth Amendment. *See, e.g., Feliciano v. Gonzales*, 13 F. Supp. 2d 151, 208–09 (D.P.R. 1998) (finding that the defendant's "inability … to properly isolate cases of active tuberculosis," the "insufficient medical dormitory beds," the failure to "fully screen incoming inmates," and the failure to "provide for a sick call system that ensures access to care and that is capable of effectively handling emergencies" constituted deliberate indifference); *Martinez-Brooks,* 2020 WL 2405350, at *22 (finding likelihood of success shown on deliberate indifference claim where Warden failed to transfer medically vulnerable prisoners from FCI Danbury to home confinement in any meaningful numbers during COVID-19 crisis).

### 3. Respondents Acted With Deliberate Indifference to the Medical Needs of COVID-19 Positive Prisoners.

It is also clear that Respondents have acted with deliberate indifference to the medical needs of Lompoc prisoners who tested positive for COVID-19. Deliberate indifference to medical needs may be shown when prison officials deny, delay or internationally interfere with medical treatment or it may be shown by the way in which prison physicians provide medical care." *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006).

Respondents here have denied, delayed and provided constitutionally inadequate care. The practice of denying prisoners medical treatment unless they have a temperature higher than 100.4 degrees[144] is highly problematic—one study has indicated that 70% of patients sick enough to be admitted to the hospital due to COVID-19 did not even have a fever.[145] Nor are Petitioners being regularly

---

[144] Rim Decl. Exh. P (Lumpkin Decl. ¶ 27).

[145] Ariana Enjung Cha, In New York's largest Hospital System, *Many Coronavirus Patients on Ventilators Didn't Make It*, THE WASHINGTON POST (Apr. 22, 2020),

monitored and treated. Petitioner Torres had to collapse in his cell before he was
taken to the hospital.[146] Petitioner Fears has experienced chills, body aches, and a
dry cough but has still never been tested or consulted with a doctor.[147] Petitioner
Fears indicates that staff are so overwhelmed that they have stopped accepting
requests for medical care since the outbreak started.[148] As of May 21, Respondents
have stopped even checking temperatures.[149] By failing to also monitor more
subjective symptoms, Respondents are missing a critical opportunity to identify
patients who may be deteriorating. Respondents are not allowing regular access to
the commissary to allow prisoners to buy over-the-counter medications such as
acetaminophen to reduce fever.[150] It is unacceptable that prisoners at Lompoc are
unable to obtain medical care until they have hit "rock bottom"—or in the case of
Petitioner Torres, literally on the floor dying.[151]

Respondents' failure to follow CDC guidance on treatments and utter
abdication in providing requested medical care for COVID-19 symptoms is
evidence of deliberate indifference. *See, e.g. Banks v. Booth,* No. 20-cv-00849, at
\*10, 21 (D.D.C. April 20, 2020) (fact that "inmates who have requested medical aid
for COVID-19 symptoms report long waits for medical care, testing or separation

---

https://www.washingtonpost.com/health/2020/04/22/coronavirus-ventilators-survival/

[146] Rim Decl. Exh. F (Carror Decl. ¶ 6).

[147] Threatt Decl. ¶ 18.

[148] Rim Decl. J (Fears Decl. ¶ 7).

[149] Threatt Decl. ¶ 18.

[150] Center for Disease Control and Prevention, What to Do If You are Sick,
https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html
(last accessed June 1, 2020); Rim Decl. Exh. K (Roberts Decl. ¶ 9).

[151] Rim Decl. Exh. F (Carror Decl. ¶¶ 6, 10).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

from the general population" is evidence of deliberate indifference). Significantly, Respondents' level of medical care falls far below other prisons faced with the challenges of COVID-19. Other prisons are providing multiple vital-sign assessments by medical staff each day, in addition to temperature checks, are monitoring subjective symptoms, and are providing medication to control fever. *See, e.g. Camacho Lopez v. Lowe,* No. 3:20-cv-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020) (finding no deliberate indifference because prisoner was placed in medical isolation as soon as he tested positive, was given at least three vital-sign assessments by medical staff daily, in addition to twice-daily temperature checks, medication as needed to control his fever, and a prescription for a multivitamin and Gatorade for nourishment and hydration); *Derron B. v. Tsoukaris*, No. 20-cv-3679 , 2020 WL 2079300, at *11 (D.N.J. Apr. 30, 2020) (finding no deliberate indifference where prisoners are being seen on a daily basis during which their subjective complaints are recorded and their vital signs, along with other relevant testing such as temperature). Dr. Samra, who works in correctional institutions, and is familiar with appropriate standards in such settings, notes that Lompoc's failure to provide monitoring, treat those who display symptoms, and provide access to physicians does not provide the minimum level of acceptable care.[152]

Dr. Samra further explains that in the context of a very limited healthcare system at a prison facility (and possible staffing shortages due to COVID-19 outbreak among staff), "the inability to swiftly identify those prisoners in need of substantial and proactive medical intervention and either begin an appropriate treatment regimen or transport them to a civilian hospital will only cause needless pain and deaths."[153] Given the enormous number of medically vulnerable prisoners who have tested positive at Lompoc, it is hard to imagine how Lompoc could

---

[152] Rim Decl. Exh. L (Samra Decl. ¶ 18.)

[153] Rim Decl. Exh. L (Samra Decl. ¶ 19.)

3651124

1  provide constitutionally adequate medical care at this time.

2      Lompoc is incapable of providing constitutionally adequate care to the

3  number of prisoners currently in its care. It is imperative that the prisoners be

4  evaluated for home confinement pursuant to a structured, court-supervised process

5  for making individualized determinations for release *as soon as possible*. Prisoners

6  who are not dangerous and have appropriate release plans must be released to home

7  confinement to address this constitutional catastrophe.

8      For those prisoners who will remain at Lompoc, and who have or will test

9  positive, the Court should grant injunctive relief that requires Respondents to follow

10  CDC guidelines and provide essential medical treatment and monitoring. Prisoners

11  should be monitored by doctors or medical staff about their symptoms and prognosis

12  so that they can be aware of any change in their health that marks a potential

13  decline. Moreover, once the population density at Lompoc has been reduced,

14  Respondents can and must begin treating underlying conditions once again, which,

15  of course, is recommended by the CDC.[154]

16      **4.**    **Petitioners Are Not Required To Exhaust Administrative**
17          **Remedies Here.**

18      Respondents have not yet raised an affirmative defense of failure to exhaust

19  administrative remedies, but based on the arguments BOP has made in other similar

20  cases, Respondents expect that the BOP will argue that Petitioners are unlikely to

21  succeed on their claims for relief because they failed to exhaust administrative

22  remedies.

23      **a.**    **Exhaustion of administrative remedies for the § 2241**
24          **claim should be waived**

25

26  [154] Center for Disease Control and Prevention, Groups at Higher Risk,
27  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-
28  higher-risk.html (last accessed June 1, 2020)

3651124

In the Ninth Circuit, "the exhaustion requirement is prudential, rather than jurisdictional, for habeas claims." *Hernandez v. Sessions,* 872 F.3d 976, 988 (9th Cir. 2017). There are two potential administrative processes that BOP may argue must first be exhausted: (1) home detention consideration under the CARES Act, and (2) requests for compassionate release under the First Step Act. Both of these arguments lack merit.

As an initial matter, with respect to release under the CARES Act, the exhaustion require has already been met because *there is no administrative process* for CARES Act release to home confinement. BOP has told prisoners, "[I]nmates do not need to apply or request to be considered for CARES act" release to home confinement.[155] There is no way for prisoners to make a case to BOP as to why they should be considered for CARES Act release, including no way for them to present a release plan.

With respect to compassionate release, while typically BOP has 30 days to respond to such applications, the Ninth Circuit has held that the exhaustion requirement does not apply when the petitioner is likely to suffer an irreparable injury without immediate judicial relief, where administrative remedies are inadequate or not efficacious or where pursuit of the administrative remedy would be futile. *Id*. The Ninth Circuit's principles regarding equitable waiver of exhaustion requirements have been specifically applied by courts to find that exhaustion of remedies was waived at the Lompoc Prison Complex due to COVID-19. As one court put it in discussing Lompoc:

> [t]he BOP is overwhelmed by the unique challenges COVID-19 presents within correctional institutions and may simply not have the capacity to process compassionate relief requests at the moment. The extraordinary and unprecedented circumstances faced by prisons in light of the COVID-19 pandemic have rendered

---

[155] *See* Rim Decl. Exh. Q (Talking Points for Inmates Asking About Early Releases During Covid-19 as of 4/20/20).

administrative exhaustion futile.

*United States v. Connell*, 2020 WL 2315858, at *5(internal citations omitted); In fact, the Acting Warden at Lompoc even ignored a direct request from a court to consider and rule on a request for compassionate release. *Pippin,* 2020 WL 2602140, at *2 (Court "implored" FCI-Lompoc to respond to a compassionate release request, and even though FCI-Lompoc was sent the Court's order in an email, FCI-Lompoc never responded to the compassionate release request). Another court pointed out that Lompoc has only an acting warden and that repeated attempts to get a response on a request for compassionate release, went unanswered. *Gorai,* 2020 WL 1975372, at *2 ("In light of the rapidly developing circumstances surrounding the COVID-19 pandemic, the court finds no reason to delay its determination"). Moreover, the *Connell* court found that these lengthy delays and refusals to consider requests for compassionate release irreparably harm prisoners: "given the speed at which COVID-19 is spreading within correctional institutions, each day of delay puts defendants at higher risk of irreparable harm." *Connell,* 2020 WL 2315858, at *5; *see also Fischman*, 2020 WL 2097615, at * 3 (discussing exhaustion in the context of a similarly extensive outbreak of COVID-19 at FCI Terminal Island: "as the Bureau of Prisons faces a prison population at FCI Terminal Island where over 60% of inmates have COVID-19, the Court finds no reason to conclude that a response from the Bureau of Prisons is possible, let alone likely within the next business day. . . [u]nfortunately, [the petitioner's] health has already been compromised in the few weeks since he filed this motion. Indeed, [his] case illustrates the difference that just a few days' delay may have under these circumstances. [Petitioner] first tested negative for COVID-19 on April 24, 2020. Just four days later, on April 28, 2020, he tested positive."); *accord Martinez-Brooks*, 2020 WL 2405350, at *18–19 (finding exhaustion waived on section 2241 class action habeas request for release to home confinement based on threat of COVID-19 exposure because Petitioners are likely to suffer irreparable harm if

1    required to exhaust, given the rapid spread of COVID-19 at Danbury prison and the

2    length of the administrative remedy process); *cf. United States. v. Paige*, 369 F.

3    Supp. 2d 1257, 1259–60 (D. Mon. 2005) (finding exhaustion waived in the context

4    of a § 2241 claim).

5                    **b.      Exhaustion is not required under the PLRA because an**

6                             **administrative remedy is "effectively unavailable" at**

7                             **this time.**

8            Petitioner is also seeking injunctive relief directly under the Eighth

9    Amendment of the United States Constitution to change Lompoc's practices with

10   respect to medical treatment, isolation, quarantine, sanitation and use of PPE, a

11   claim that is subject to the Prison Litigation Reform Act ("PLRA") and its

12   exhaustion requirement.[156]  But the PLRA requires only that a prisoner exhaust

13   those administrative remedies "as are available." *Sapp v. Kimbrell,* 623 F.3d 813,

14   822 (9th Cir. 2010), *superseded by statute on other grounds as stated in Avery v.*

15   *Paramo*, No. 13-cv-2261 BTM, 2015 WL 4923820, at *14 (S.D. Cal. Aug. 18,

16   2015).  As explained in detail below, administrative remedies are not available

17   because *Lompoc is not currently allowing access to the grievance process*.

18           The PLRA therefore does not require exhaustion when circumstances render

19   administrative remedies "effectively unavailable."  *Id.* As the Supreme Court has

20   explained, the circumstances in which an administrative remedy is unavailable

21   include "when (despite what regulations or guidance may promise) it operates as a

22   simple dead end—with officers unable or consistently unwilling to provide any

23   relief to aggrieved inmates" or "when prison administrators thwart inmates from

24   taking advantage of a grievance process." *Ross v. Blake,* 136 S. Ct 1850, 1859–60

25

26   ───────────────

27   [156] Like the exhaustion requirement for § 2241, the PLRA's exhaustion requirement
     is not jurisdictional and prisoners are not required to specially plead or demonstrate

28   exhaustion in their complaints. *Jones v. Bock,* 549 U.S. 199, 216 (2007).

3651124

1  (2016). Justice Sotomayor recently addressed the availability of administrative
2  remedies during the pandemic: "if a plaintiff has established that the prison
3  grievance procedures at issue are utterly incapable of responding to a rapidly
4  spreading pandemic like Covid-19, the procedures may be "unavailable . . . much in
5  the way they would be if prison officials ignored the grievances entirely. . .in these
6  unprecedented circumstances, where an imminent faces an imminent risk of harm
7  that the grievance process cannot or does not answer, the PLRA's textual exception
8  could open the courthouse doors where they would otherwise stay closed." *See*
9  *Valentine v. Collier,* 590 U.S. ___ (2020), 2020 WL 249751, at *3 (Mem)
10 (Sotomayor, *J.*).

11        Here, it is clear that Lompoc's grievance procedures that exist are utterly
12 incapable of addressing to the critical health and safety needs of the prisoners in its
13 care. According to Mr. Lumpkin, on or about April 13, just a week after he filed his
14 request, a prison official announced, "do not submit any request for compassionate
15 release, or grievances because staff is not accepting them because we are
16 understaffed."[157]  From then on, counselors stopped giving out or accepting
17 grievance forms.  One prisoner was told by his counselor that he would forward his
18 compassionate release request "to my shredder."[158] Compounding the problem is the
19 fact that release requests must be received by the Warden, and Lompoc has been
20 through three wardens in the past two months and even now has only an acting
21 warden.[159] *See e.g. Gorai,* 2020 WL 1975372, at *2 (noting "that defendant's
22 facility, Lompoc USP, has only an acting warden" in finding that there was "no
23 reason to delay" deciding request for compassionate release until administrative

[157] Rim Decl. Exh. P (Lumpkin Decl. ¶ 46).

[158] *Id*. ¶ 47.

[159] https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/

3651124

58

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

1  remedies were exhausted).  In short, prison administrators are thwarting prisoners
2  from taking advantage of a grievance process such that administrative remedies are
3  "effectively unavailable."  As such, exhaustion is not a bar to Petitioners' direct
4  Eighth Amendment challenge to the conditions of confinement at Lompoc during
5  the COVID-19 outbreak.

6  **5.    Petitioners' habeas claims are properly brought under**
7  **Section 2241**

8  Based on arguments made by BOP in other similar actions brought against
9  different prisons, Petitioners anticipate that Respondents will argue that Petitioners
10 are unlikely to succeed on the merits because they cannot seek redress for their
11 complaints under Section 2241. As an initial matter, it is important to point out that
12 Petitioners bring their claims under two separate procedural vehicles. First, they
13 seek either compassionate release or release to home confinement under section
14 2241 based on violations of the Eighth Amendment. Second, they seek injunctive
15 relief directly under the Eighth Amendment to institute appropriate conditions of
16 confinement to prevent the further spread of COVID-19 and to provide
17 constitutionally adequate medical care for confirmed COVID-19 cases. Both Ninth
18 Circuit law and recent cases from other jurisdictions grappling with these same
19 issues make clear that Petitioners claims are brought under the correct statutory
20 provisions.

21 Under Ninth Circuit precedent, a habeas corpus petition brought pursuant to
22 Section 2241 is the proper vehicle for a federal prisoner to challenge "the fact or
23 duration of his confinement." *Preiser v. Rodriguez*, 411 U.S. 475, 498–99 (1973).
24 Put another way, where a prisoner "challenge[s] the manner, location, or conditions
25 of a sentence's execution", it is appropriate to do so pursuant to Section 2241.
26 *Hernandez v. Campbell*, 204 F.3d 861, 863 (9th Cir. 2000). Courts have already
27 ordered prisoners released from custody under Section 2241 due to officials'
28 inability to implement appropriate preventative, diagnostic, and/or treatment

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

protocols in the face of the COVID-19 pandemic. *See Wilson v. Williams,* No. 4:20-cv-00794, 2020 WL 1940882, at \*5, 10 (N.D. Ohio Apr. 22, 2020) (concluding that a similar habeas petition brought by prisoners at FCI Elkton on seeking release on behalf of a class of medically vulnerable prisoners "ultimately seek[s] to challenge the fact or duration of confinement," and is properly brought under section 2241), *appeal filed* (6th Cir. Apr. 27, 2020); *Wilson v. Williams*, 20-3447, ECF No. 23-1 (6th Cir. May 4, 2020) (denying the Government's motion to stay, holding that, "[w]here a petitioner claims no set of conditions would be constitutionally sufficient, we construe the petitioner's claim as challenging the fact of the confinement," and concluding that the District Court had jurisdiction under §2241); *Martinez-Brooks,* 2020 WL 2405350, at \*16–17 (concluding that a similar habeas petition brought by prisoners at FCI Danbury seeking release on behalf of a class of medically vulnerable prisoners was properly brought under section 2241 because it challenged "the fact or duration of confinement" by claiming that "no constitutional conditions of confinement are possible under the circumstances").

As in *Martinez-Brooks* and *Wilson,* Petitioners here contend that the fact of their confinement in prison itself amounts to an Eighth Amendment violation and nothing short of an order ending their confinement at Lompoc will alleviate that violation. They allege that their medical history, and the medical history of other medically vulnerable class members and the outbreak at Lompoc combine to place them in grave danger from COVID-19, that at current facility population levels, they and other Lompoc inmates cannot comply with CDC guidelines for physical distancing. As a result, any other mitigating steps will fail to meaningfully decrease the risk of contracting COVID-19 at Lompoc, and, given the size of the outbreak at Lompoc, adequate medical care cannot be given for either COVID-19 or pre-existing conditions. In short, because Petitioners contends that the Eighth Amendment violation here inheres in their incarceration and cannot be remedied unless they are removed from that setting, they are challenging the fact – or

existence – of their confinement. And, since this is a habeas petition challenging the fact or duration of confinement in prison, the PLRA, and its procedural hurdles, does not apply. 18 U.S.C. § 3636(g)(2); *Naddi v. Hill*, 106 F.3d 275, 277 (9th Cir. 1997) ("Congress was clearly not concerned with habeas corpus proceedings when they enacted the PLRA . . . ."); *Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001) ("[T]he requirements of the [PLRA] do not apply to habeas proceedings."); *Harris v. Garner*, 216 F.3d 970, 979 n.7 (11th Cir. 2000) ("28 U.S.C. § 2241, 2254, and 2255 filings . . . are not covered by the PLRA.").[160]

## C. Petitioners and the Class Face Irreparable Harm if They Continue to Be Incarcerated and If Unsafe Conditions are Allowed to Persist At Lompoc

Petitioners and the Class face a substantial risk that they may contract COVID-19, and suffer from serious illness and/or death. For Petitioners and Class members that have contracted COVID-19, they are at risk of needlessly suffering more serious, long-lasting consequence or even death due to inadequate care if the relief sought is not granted.

A plaintiff who seeks a TRO must demonstrate that he is likely to suffer

---

[160] Petitioners also properly bring their civil rights claims related to their conditions of confinement directly under the Eighth Amendment. Prisoners may seek injunctive relief directly under the Eighth Amendment to compel prison officials to provide adequate medical care and institute measures to prevent the spread of deadly disease. *See, e.g.*, *Thomas v. U.S*, 779 F. Supp. 2d 154, 158 (D.D.C. 2011) (finding that a claim to compel prison officials to provide adequate medical care for prisoner's chronic conditions brought directly under the Eighth Amendment is "not foreclosed"); *Farmer*, 511 U.S. at 846 ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied" with regard to federal prisoner "it may grant appropriate injunctive relief."); *Corr Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (recognizing that a lawsuit for injunctive relief has been "long recognized as the proper means for preventing entities from acting unconstitutionally").

1  irreparable harm in the absence of a TRO. *See Winter,* 555 U.S. at 20.[161]  To

2  establish irreparable harm, a plaintiff must demonstrate that "remedies available at

3  law, such as monetary damages, are inadequate to compensate" for the injury. *Herb*

4  *Reed Enters., LLC v. Fla. Entm't Mgmt.*, 736 F.3d 1239, 1249 (9th Cir. 2013). "It is

5  well established that the deprivation of constitutional rights 'unquestionably

6  constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir.

7  2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

8      A likelihood of irreparable harm is clearly present here. Petitioners and other

9  Lompoc prisoners face severe illness, pain, and potentially death if the TRO is not

10  granted. There is already an extreme outbreak of COVID-19 at Lompoc and three

11  lives have been lost. Petitioners and the other inmates, many of whom are medically

12  vulnerable, are at serious risk of grave or life-threatening complications due to the

13  overcrowding, inability to socially distance, lack of adequate PPE and disinfectant

14  solution and the inadequate, indifferent medical care.

15      It is axiomatic that a substantial risk of serious illness or death, such as that

16  posed here, constitutes irreparable harm. "The Constitution protects those in

17  detention against a condition of confinement that is sure or very likely to cause

18  serious illness and needless suffering the next week or month or year." *Fraihat*,

19  2020 WL 1932570 at *27 (internal citations and quotations omitted) (Bernal, J.); *see*

20  *also Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who

21  plainly proved an unsafe, life-threatening condition in their prison on the ground

22  that nothing yet had happened to them."); *Harris v. Bd. of Supervisors, Los Angeles*

23

24  [161] The plaintiff "need not further show that the action sought to be enjoined is the
exclusive cause of the injury." *M.R. Dreyfus,* 697 F.3d 706, 728–29 (9th Cir. 2004)
25  (finding that a challenged regulation that increases risk of institutionalization
26  inflicts cognizable irreparable injury for purposes of a preliminary injunction where
the regulation "exacerbate[s] that risk" even though "that risk is not exclusively
27  attributable to the challenged regulation").

28

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

*Cty.*, 366 F.3d 754, 766 (9th Cir. 2004) (finding likelihood of "pain, infection, amputation, medical complications, and death" constituted irreparable harm).[162]

For this reason, courts around the country, including the Central District of California have concluded that incarcerated individuals "established they will suffer the irreparable harm of increased likelihood of severe illness and death" from COVID-19 "if a [TRO or] preliminary injunction is not entered." *Fraihat*, 2020 WL 1932570, at \*27 (Bernal, J.); *see also Castillo v. Barr*, --- F. Supp. 3d ---, 2020 WL 1502864, at \*1 (C.D. Cal. Mar. 27, 2020) (Hatter, J.) (granting TRO and finding that the immigration detainee petitioners established that they are likely to suffer irreparable harm due to the risk of contracting COVID-19 when they are not kept six feet apart from other detainees); *Kaur v. U.S. Dep't of Homeland Security,* No. 2:20-cv-03172, 2020 WL 1939386, at \*3 (C.D. Cal. April 22, 2020) (Wright, J.) (finding that "the risk posed in immigration detention facilities of contracting and dying from [COVID-19] is so severe that it constitutes an irreparable harm supporting a TRO"); *Doe v. Barr*, No. 20-cv-02141, 2020 WL 1820667, at \*1, 9 (N.D. Cal. April 12, 2020) (granting TRO for "immediate release" of Section 2241 petitioner in ICE custody because detainees at the facility where he was housed "live in close quarters, cannot practice social distancing, do not have masks, and do not have access to adequate disinfecting and cleaning supplies"); *Bent v. Barr*, No. 19-cv-

---

[162] Indeed, irreparable harm can be established by showing a substantial likelihood of emotional or psychological injury. *Chalk v. U.S. Dist. Court Cent. Dist. of California*, 840 F2d 701, 709-10 (9th Cir. 1988) (finding that emotional and psychological injury cannot be adequately compensated for by a monetary award and therefore constitutes irreparable injury); *Edmo v. Corizon, Inc.,* 935 F.3d 757, 797-98 (9th Cir. 2019) (irreparable harm existed with respect to denial of treatment for inmates gender dysphoria due to "ongoing psychological distress and the high risk of self-castration and suicide she faces absent surgery."); *Inland Empire-Immigrant Youth Collective v. Nielsen,* No. 17-cv-2048, 2018 WL 1061408, at \*20 (C.D. Cal. February 26, 2018) (finding that loss of DACA causes emotional pain, which is a cognizable form of irreparable injury).

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

06123, 2020 WL 1812850, at *1–2 (N.D. Cal. Apr. 9, 2020) (granting TRO for release of Section 2241 petitioner, who alleged failure to adequately protect him from COVID-19 "due to overcrowding and lack of adequate cleaning supplies"); *Wilson v. Williams*, No. 20-3447, ECF No. 23, at *3 (6th Cir. May 4, 2020) (ordering release of inmates where they "claim[ed] no set of conditions would be constitutionally sufficient" during the COVID-19 pandemic, which "challeng[ed] the fact of the confinement"); *Coronel v. Decker*, --- F. Supp. 3d ---, 2020 WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020) (issuing TRO for "immediate[] release" of Section 2241 Petitioners asserting a deliberate indifference medical treatment claim); *Jovel v. Decker*, No. 20-cv-308, 2020 WL 1467397, at *1–2 (S.D.N.Y. Mar. 26, 2020) (due to COVID-19, releasing Section 2241 petitioner during pendency of removal proceedings); *Thakker v. Doll*, No. 20-cv-0480, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020) (issuing TRO and ordering facilities to "immediately" release, on their own recognizance, habeas Petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19"); *cf. Xochihua-Jaimes v. Barr*, 798 F. App'x 52 (Mem) (9th Cir. Mar. 24, 2020) (*sua sponte* ordering release of immigration detainee during pendency of appeal); *United States v. Brady*, No. 20--623, 2020 WL 1865486, at *1–3 (M.D. Pa. Apr. 14, 2020) (court *sua sponte* construed motion for immediate release to home confinement as a habeas petition under Section 2241 and transferred matter to jurisdiction where petitioner was incarcerated).

### D. It Is in the Public Interest to Release Appropriate Prisoners to Home Confinement and Institute Other Measures to Prevent the Spread of COVID-19

Where the government is the opposing party, balancing of the harm and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities and public interest sharply incline in Petitioners' favor. "[I]t is always in the public interest to prevent the violation of a party's constitutional

1  rights." *Melendres*, 695 F.3d at 1002 (internal quotation omitted). That is especially

2  true here, where the constitutional rights at stake go the physical well-being of the

3  Petitioners. Moreover, there can be no public interest in exposing vulnerable persons

4  to increased risks of severe illness and death. "Faced with such a conflict between

5  financial concerns and preventable human suffering, we have little difficulty

6  concluding that the balance of hardships tips decidedly in plaintiffs' favor."

7  *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th

8  Cir. 1983)).

9        Numerous courts have already found a significant public interest in releasing

10  ill and medically vulnerable prisoners and detainees during the COVID-19

11  pandemic. *See e.g. Bent,* 2020 WL 1812850, at \*7 (finding it was in the public

12  interest to release detainee with prior violent felony conviction to prevent spread of

13  COVID-19); *Castillo,* 2020 WL 1502864, at \*6 (ordering release of detainee and

14  finding that "[t]he public has a critical interest in preventing the further spread of the

15  coronavirus."); *Martinez-Brooks,* 2020 WL 2405350, at \*28 (finding it was in the

16  public interest to release to home confinement medically vulnerable prisoners at FCI

17  Danbury); *Wilson,* 2020 WL 1940882, at \*9–10 (finding that it was in the public

18  interest to release to home confinement medically vulnerable prisoners at FCI

19  Elkton).

20        The relief requested here – release of appropriate inmates to home

21  confinement (to be identified through a structured, court-supervised individualized

22  determination), and institution of appropriate precautionary measures and

23  constitutionally adequate medical care at the prison would protect the staff at

24  Lompoc as well as the community at large.[163] That is true even for patients who

25

---

26  [163] It is important that Respondents engage in individualized determinations and not

27  rely on categorical bars based on the nature of an offense, when time, disciplinary record, and other factors can indicate that a prisoner is not a danger to society. *See*

28  *e.g. Pippin,* 2020 WL 2602140, at \*3 (granting compassionate release to sex

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

have tested positive for COVID-19. Releasing COVID-19 positive medically

vulnerable prisoners to home confinement reduces the risk that local hospitals will

be overwhelmed by people who are more likely to need the most substantial care,

leaving more resources to treat the community. *See United States v. Arreola-*

*Bretado,* --F.Supp.3d--, 2020 WL 2535049, at *3 (S.D. Cal. May 15, 2020) ("The

Government argues that Ms. Arreola-Bretado is dangerous for the sole reason that

she is COVID-19-positive. But with appropriate medical care, she will not be a

harm to others. Returning to her family to quarantine is safer for the community

than is keeping Ms. Arreola-Bretado confined to Otay Mesa where she will likely be

a risk to other inmates and staff who have not yet contracted COVID-19."). It would

also reduce staff interaction with COVID-19 positive prisoners, which is in the

public interest because staff members who come into contact with COVID-19-

positive prisoner may spread the disease to other prisoners as well as their families

and communities.[164]  Release of prisoners to home confinement also helps protect

the prisoners who remain at Lompoc by reducing the population density in the

prison, which will finally allow the implementation of physical distancing measures.

Importantly, according to Dr. Samra, reducing the prison population effectively

reduces the number of people inside who will become ill enough to require outside

hospitalization, which also reduces the strain on community hospital resources and

decreases chances of sick prisoners coming into contact with other members of the

---

offender, finding based on based on age, lack of disciplinary infractions, and other current facts that he was no longer danger to the safety of any other person or to the community despite conviction for sex offense from 2016 and prior conviction for sex offense in 2002).

[164] Sandhya Kajeepeta & Seth J. Prins, *Why Coronavirus in Jails Should Concern All of Us*, THE APPEAL (Mar. 24, 2020), https://theappeal.org/coronavirus-jails-public-health/.

3651124

general public.[165] Accordingly, the relief Petitioners seek can slow or stop the spread of infection (or re-infection) and ensure appropriate and proactive treatment of infected prisoners, to the benefit of prisoners and staff and, ultimately, ***the community at large***."[166] Given that Petitioners here are requesting a structured, court-supervised process for individualized consideration of each prisoner's suitability for release to home confinement, releasing even prisoners who have tested positive for the virus will not put the public in harm's way. As part of this structured process, Petitioners specifically request that Respondents provide each prisoner with an opportunity to present an appropriate home release plan. Each of the Petitioners has such a plan already in place. Each of the named Petitioners plans to live, *and self-quarantine*, at the home of a relative, where they will have access to doctors familiar with conditions and medical history. Petitioner Torres plans to live with his sister, Petitioner Reed with his brother, Petitioner Garcia with his parents, Petitioner Brown with his daughter, and Petitioner Fears with his daughter.

The requested actions – which will help prevent burdening hospitals and healthcare systems, and allow our communities to safely reopen sooner – are undeniably in the public interest.

**E.      This Court Has the Power to Grant a TRO and Issue a Provisional Order of Enlargement of Custody While This Habeas Action is Pending.**

In light of the emergency nature of Petitioners' circumstances and the substantial health and safety issues raised by their petition, they request that the Court act immediately to safeguard their well-being and the well-being of the other prisoners at Lompoc and enter an Order enlarging their custody to place them and other appropriate members of the Class on home confinement during the pendency

---

[165] Rim Decl. Exh. L (Samra Decl. ¶ 22).

[166] *Id*. at ¶ 24 (emphasis added.)

3651124

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

of this habeas action.

Federal district courts have authority, when habeas actions are pending, to "enlarge" the custody of petitioners. Enlargement is not release. Rather, it is a provisional remedy that modifies custody by expanding the site at which it takes place. *That is, the petitioner remains in custody, but the place of custody is changed, or "enlarged," upon order of the court, from a particular prison to a hospital, halfway house, a person's home, or another setting*. See Declaration of Professor Judith Resnik Regarding Enlargement and the Use of Provisional Remedies for Detained Individuals ("Resnik Dec.) ¶¶ 29-30; *see also Wilson*, 2020 WL 1940882, *4 (describing the authority of the district court to grant enlargement pending a ruling on the merits of a habeas petition, noting that "[w]hen a court exercises its power to 'enlarge' the custody of a defendant pending the outcome of a habeas action, the BOP maintains custody over the defendant, but the place of custody is altered by the court"); *Martinez-Brooks,* 2020 WL 2405350, at *14 (in Section 2241 petition based on COVID-19, granting TRO seeking "enlargement to home confinement" where prisoners "would remain within the custody of BOP").

Enlargement is part and parcel of Congress's authorization for federal judges under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. § 2243. The Ninth Circuit has explicitly recognized the power of district courts to grant release pending a habeas decision where there are "special circumstances" and "a high probability of success." *See Land v. Deeds,* 878 F.2d 318, 318 (9th Cir. 1989); *see also Hall v. Superior Court,* No. 09-cv-5299, 2010 WL 890044, at *2–3 (N.D. Cal. March 8, 2010) (holding that a district court can grant bail to state prisoners pending a habeas decision if the prisoner shows "exceptional circumstances" and a "high probability of success.")[167]

---

[167] Other circuits that have considered this issue have likewise concluded that a

*EX PARTE* APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION

Applying this standard, at least two courts have granted enlargement to classes of prisoners pending final adjudication of their habeas petitions based on the risks presented by the COVID-19 crisis. *Wilson,* 2020 WL 1940882; *Martinez-Brooks v. Easter,* 2020 WL 2405350. In granting enlargement the *Martinez-Brooks* courts put in place a structured, supervised process for BOP to determine which prisoners could appropriately be released to home confinement in order to decrease the density of the prisons to the degree of safety necessary to prevent the spread of COVID-19. In particular, the court required on an explicit timeframe:

- The identification of all medically vulnerable prisoners;

- Implementation of a process that makes full and speedy use of the home confinement authority under 18 U.S.C. § 3624(b) and the CARES Act by (a) prioritizing for review for home confinement all inmates identified on the list, (b) assigning substantial weight in that review to the inmate's risk factors for COVID-19 based on CDC guidance, (c) eliminating all requirements that the inmate have served some portion of his or her sentence to be eligible for placement on home confinement, (d) eliminating the requirement that a "primary or prior offense" not be a violent offense; (e) eliminating the requirement that the inmate be "without incident reports in the past 12 months (regardless of severity level)"; (f) modifying any requirement that a person approved for home confinement be quarantined at the facility for 14 days to allow for immediate release to home confinement for those inmates as to whom Respondent verifies, after reasonable inquiry, that the inmate is not showing symptoms and is able to self-isolate for the same period in the home confinement setting;

- Provision of written notice of (a) either a referral of the matter in writing with recommendation of approval of the request or (b) denial of the request, together with the appropriate appeal form to each inmate identified who had made a written request for compassionate relief based on COVID-19 but has not yet received a decision;

- Implement a process by which inmates who make a request for compassionate release based on COVID-19 receive notice of either

provisional remedy of enlargement (or bail) pending a decision on a habeas petition is appropriate. *See, e.g., Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir.2001); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972); *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir.1974*); Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir.1985); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981); *Baker v. Sard*, 420 F.2d 1342, 1343–44 (D.C. Cir. 1969).

3651124

referral or denial within 7 days

- File a statement on the docket explaining whether and how the criteria in the BOP's Program Statement governing compassionate release have been updated to take account of the COVID-19 crisis

- Complete review of the home confinement process and approve or deny such person home confinement;

- Provide to the Court an individualized explanation of each denial of home confinement as to an inmate identified pursuant to the home confinement process implemented by the Court, including at least a brief description of the factual basis for any factors deemed to outweigh the danger to the inmate from COVID-19.

*Martinez-Brooks,* 2020 WL 2405350, at \*32–34.

This individualized, supervised process-based remedy left decision making in the hands of BOP, while ensuring that BOP makes timely decisions based on appropriate considerations in light of the nature of the threat from COVID-19. Petitioners here request a similar, process-based remedy in order to preserve Petitioners' current state of health and wellbeing and to make the remedy of release effective if they prevail in this action. Petitioners have articulated the specific relief requested in a concurrently filed Proposed Order. Petitioners have demonstrated "extraordinary circumstances" and shown a "high probability of success" supporting enlargement relief in light of the rampant spread of COVID-19 at Lompoc, the particular threat to their health, and Respondents' failure to ensure necessary social distancing, effective quarantine and isolation procedures, adequate sanitation and adequate medical care. Enlargement pursuant to a supervised process is, thus, both appropriate and necessary here.

## IV. CONCLUSION

For the foregoing reasons, Petitioners respectfully request that Court grant the Temporary Restraining Order and impose a structured, court-supervised process for individualized consideration of each prisoner's suitability for release on an accelerated schedule that focuses on the critical factors of prisoner and public safety currently ignored by the current home confinement review process at Lompoc.

3651124

70

1  Petitioners further request that the Court require Respondents to adhere to CDC

2  guidance regarding the prevention and treatment of COVID-19.

3                                     Respectfully submitted,

4  DATED:  June 1, 2020             Bird, Marella, Boxer, Wolpert, Nessim,
                                     Drooks, Lincenberg & Rhow, P.C.

5

6                                  By:       */s/ Naeun Rim*

7                                            Naeun Rim
                                   Attorneys for Plaintiff-Petitioners

8

9  DATED:  June 1, 2020             Peter J. Eliasberg
                                     Peter Bibring

10                                   ACLU Foundation of Southern California

11                                 By:       */s/ Peter Bibring*

12                                         Peter Bibring
                                   Attorneys for Plaintiff-Petitioners

13

14 DATED:  June 1, 2020             Donald Specter

15                                   Sara Norman
                                     Prison Law Office

16

17                                 By:       */s/ Donald Specter*
                                         Donald Specter

18                                 Attorneys for Plaintiff-Petitioners

19

20

21

22

23

24

25

26

27

28

3651124

71

# CERTIFICATE OF AUTHORIZATION
# TO SIGN ELECTRONIC SIGNATURE

Pursuant to Local Rule 5-4.3.4(a)(2)(i) of the Signatures Procedures for the United States District Court for the Central District of California, filer attests that all other signatories listed concur in the filing's content and have authorized this filing.

DATED: June 1, 2020

Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.

By: _/s/ Naeun Rim_
_____
Naeun Rim
Attorneys for Plaintiff-Petitioners

3651124

_EX PARTE_ APPLICATION FOR TRO AND OSC RE: PRELIMINARY INJUNCTION